

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-14-2002

# USA v. Stubbs

Precedential or Non-Precedential:

Docket 0-4342

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Stubbs" (2002). *2002 Decisions.* Paper 120.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/120

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 14, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-4342

UNITED STATES OF AMERICA

v.

CHARLES STUBBS
Appellant

Appeal From the Conviction and Judgment of Sentence
Imposed by the United States District Court
of the Western District of Pennsylvania
(D.C. Criminal. No. 99-cr-00175-1)
District Judge: Hon. Donnetta W. Ambrose

Argued December 17, 2001

BEFORE: SLOVITER, MCKEE, Circuit Judges and
HAYDEN,* District Judge

(Opinion Filed: February 14, 2002)

        Adam B. Cogan (Argued)
        One Northgate Square
        Greensburg, PA 15601
        Attorney for Appellant

        Marc I. Osborne (Argued)
        U.S. Department of Justice
        601 D Street, N.W., Suite 6111
        Washington, D.C. 20530
        Attorney for Appellee
_____

* Hon. Katharine S. Hayden, District Judge, United States District Court
for the District of New Jersey, sitting by designation.

OPINION OF THE COURT

McKEE, Circuit Judge.

Charles Stubbs appeals his conviction for robbery and
related offenses based upon several claims of error
including the legality of his warrantless arrest, and the
adequacy of his purported waiver of trial counsel.
Inasmuch as we agree that the waiver colloquy was not
sufficient to insure a proper waiver of the Sixth Amendment
right to counsel, we will reverse and remand for a new trial.

I. Background

On October 5, 1999, FBI agents received a tip from a
confidential informant that Larry Brown and Walter Baynes
were planning to rob a bank the next day. The same
informant had previously told the FBI that Brown had
robbed the PNC Bank on Frankstown Road in Penn Hills,
Pennsylvania two weeks earlier. That robbery was
"takeover" style, where the perpetrators went behind the
counters and took cash from bank tellers' drawers.

Based on this information, agents placed Brown under
surveillance. On the morning of October 6, agents saw two
men arrive at Brown's house. One arrived in a tan Dodge,
and the other arrived in a blue Chevrolet. Both men left in
the tan Dodge along with Brown. Agents followed the Dodge
to the same strip mall where the PNC Bank robbery had
occurred on Frankstown Road two weeks earlier. They saw
the Dodge "square" the block (drive all the way around),
and then leave the area and travel to another shopping mall
containing a number of banks.

The next morning, October 7, two men again arrived at
Brown's house. This time the three men left in the blue
Chevrolet. Once again agents followed as the men drove to
the mall containing the PNC Bank. The agents observed
Brown as he left the car and went into a drugstore in the
mall. He looked into the bank upon entering and leaving
the drugstore. The three men then left the strip mall and
parked in a nearby cemetery for a few minutes. They then

2

drove back to the strip mall and once again "squared" the block. The Chevrolet was next seen in the parking lot of the Squirrel Hill PNC Bank. The agents continued their surveillance as the Chevrolet left that parking lot and returned to the parking lot in the Frankstown Road mall. Agents then saw the passenger in the back seat pull a ski mask over his head. After a few minutes, the three men drove to another PNC Bank in the Great Valley Shopping Center. There, two of the men got out of the car, walked toward the bank, but then turned around.

Agents lost track of the car at 1:23 p.m. in Wilkinsburg. However, at 1:46 p.m. a radio dispatch notified the agents that a Dollar Bank in the Monroeville Miracle Mile Shopping Center had just been robbed. The dispatch said that the crime was committed by three males wearing ski masks and carrying handguns, and was a "takeover" robbery. Witnesses said that the robbers placed the money in a Kaufmann's shopping bag.

The agents concluded that Brown and his companions had robbed that bank after they lost sight of them, and the agents proceeded to Brown's house to await his return. The blue Chevrolet did return to Brown's home shortly after 2 p.m. Larry Brown, Jasper Stubbs, and the defendant, Charles Stubbs, were in the car. Agents immediately arrested the three men without a warrant, and then conducted a warrantless search of the car. They found a Kaufmann's shopping bag containing currency, ski masks, gloves, and handguns. Stubbs was thereafter formally charged with the Dollar Bank robbery, and counsel was appointed to represent him. Before trial, the cases against the three men were severed.

Stubbs began his trial represented by a court appointed attorney. However, about halfway through Stubbs' defense case, and after the prosecution had rested its case-in-chief, Stubbs asked to represent himself for the remainder of the trial. After a brief discussion, the trial judge agreed, and the trial proceeded with Stubbs representing himself. Not surprisingly, the jury convicted him of all five of the counts in the indictment, and the court subsequently sentenced him to a total of 562 months incarceration. This appeal followed.

Although Stubbs makes numerous arguments on appeal, the only one that we need to address at length involves his purported waiver of counsel.[1] Stubbs argues that his waiver of counsel was not knowing and intelligent as required by the Sixth Amendment. We agree.

## II. The Waiver of Counsel Issue[2]

Although Stubbs was represented by appointed counsel throughout most of the trial, he informed the court of his dissatisfaction with counsel and asked permission to represent himself before the trial ended. His request prompted the following exchange:

> The Court: You wanted to see me before the jury comes in?
>
> [Defense counsel]: Your Honor, in speaking with my client this morning, he indicated to me he wishes to address the Court regarding a certain matter. I don't know the nature of the matter. He wishes now to speak.
>
> The Defendant: Yes, Your Honor. Things that I have been telling my lawyer to try to accomplish here, he's not done. As of now, I feel as though my lawyer is ineffective and I wish to represent myself for the remainder of this trial.
>
> The Court So what you're asking is that you be allowed to testify without examination from Mr. Cogan and then give your closing statement?

---

1. We briefly discuss infra Stubbs' argument that there was no probable cause to support his warrantless arrest. We summarily dismiss Stubbs' claim that the district court improperly used a prior conviction to enhance his sentence.

2. Our review of whether a defendant's waiver of counsel was knowing and intelligent is plenary as it involves only legal issues. See Gov't of the Virgin Islands v. Charles, 72 F.3d 401, 404 (3d Cir. 1995); United States v. Velasquez, 886 F.2d 1076, 1086 (3d Cir. 1989).

4

The Defendant: Excuse me?

The Court: I guess what you're asking me to allow you to do is to testify without Mr. Cogan questioning you--of course, you would be subject to cross examination--

The Defendant: No, I'm going to do my own thing.

The Court: Well, your own thing has to be within the confines of the trial procedures. If you want to--

The Defendant: I am going to represent myself as of now.

The Court: Okay. Let me explain what's left in the trial. What's left in the trial is your testimony or any other witness you might have here to call and the closing arguments. That's all that's left in the trial.

The Defendant: No, there's evidence that I want to admit.

The Court: Well, if it's admissible, certainly it can be offered and the Government can object to it and I'll make rulings.

The Defendant: Thank you.

The Court: But before we continue, Ms. Kelly, do you have anything to say about this?

[The Prosecutor]: Well, I would just like to say that I think Mr. Cogan has been representing Mr. Stubbs quite well; and that if he's now decided that he no longer wants Mr. Cogan to represent him, then I think maybe the Court should advise him of the consequences of that, although they are pretty obvious, and go from there.

5

The Court: Well, maybe I'm leaving some things out, but you know you are entitled to be represented by an attorney. You understand that?

The Defendant: Yes I do. And I also know that I'm entitled to represent myself if I wish to.

The Court: You understand that if you make this decision, anything you do is subject to objection by counsel, and that if that objection is well taken, I might grant that objection. And that you are only entitled, as I have said several times, to represent yourself in accordance with the Rules of Criminal Procedure, the Rules of Evidence, and the Rules of Court as they pertain to this case. You can't do whatever you want to do if it is not legally permissible, if evidence is not legally admissible or legally competent. Do you understand that?

The Defendant: No, not really.

The Court: Well, I'm telling you that. That you are not allowed to do everything you want to because you want to do it. There are rules of Evidence, there are Rules of Procedure--

The Defendant: All I'm saying is if I have some documents that we have received already, like such as FBI logs, things like that, that I want to refer to in basically my closing--

The Court: Well, you can't refer to any facts that are not in evidence. That's one thing.

The Defendant: That's why I said I want to enter this stuff in evidence because there was just a bunch of lies told there was just simply a bunch of lies told.

The Court: Well, that's not for me to decide, for you to decide, or for the Government to decide. That's for the jury to decide.

The Defendant: Exactly, that's what I am saying. I have documentations [sic] that say they lied.

The Court: Ms. Kelly, I don't know, I agree that Mr. Stubbs should be aware of the consequences of representing himself because you don't know, as you have admitted, the Rules of Evidence, the Rules of Procedure. I'm not really sure if there's anything else that the Government feels that he should be told. And if there is, please let me know. I am not really sure either whether or not I can tell Mr. Stubbs that he can't represent himself. I don't think I can say that. But certainly I can say this: That the Government's evidence is already in. The evidence of Mr. Moses is already in. The only possible part of the trial would be your testimony, which you would have to testify under oath if you choose to testify. You are not required to testify. You are not required to do or prove anything on your behalf because it's the Government's burden to prove that you are guilty beyond a reasonable doubt. But if you do testify, do you

7

understand that you are subject to cross-examination by the Government's attorney?

The Defendant: There is no reason for me to testify if I'm representing myself. I can tell the jury what I want them to know from my own mouth.

The Court: You may not argue facts that are not in evidence. I can tell you that.

The Defendant: That's why I'm--Your Honor, I'm saying that I want--

The Court: Do you want to put--do you want to make offers now or do you want to wait until the jury comes in and I will make rulings on whatever you want to admit?

The Defendant: I want to offer--I don't know exactly--I may touch on a lot of things that--

The Court: Offer a piece of evidence if you have evidence to introduce in your case. Or do you want me to bring the jury in and do it--do you want it in front of the jury?

The Defendant: It doesn't matter to me.

The Court: It does matter. I think it should be probably. I don't know. Does anybody have any thoughts?

. . .

[Defense Counsel]: Judge, as a matter of procedure, I think Mr. Stubbs would have to be advised at this point of the consequences of his actions and then if he--

The Court: What are the consequences of his action? I told him he has to follow

8

the rules, he has to follow the Rules of Procedure, the Rules of Evidence, and if you--well--

[The Prosecutor]: And he can't say he wants to represent himself to introduce his own testimony and avoid taking the witness stand.

The Court: That's certainly true. And I hope you understand that. You say, why should I testify when I can tell the jury the facts that aren't in evidence. So if there hasn't been sworn testimony of those facts in evidence, you are going to be precluded from arguing that to a jury. Because a person who closes can only argue the evidence. That's what a closing argument is. A person argues--

The Defendant: So you are saying to me--

The Court: Excuse me, will you allow me to finish. A person argues the evidence that is presented before a jury. A person doesn't just talk to the jury and introduce evidence without being subject to cross-examination. That's not how a trial works.

The Defendant: Listen, again, I'm saying that there are certain lies that I know have been told from certain FBI logs, do you understand what I'm saying--

The Court: No, I don't understand a word of what you're saying.

The Defendant: If you would let me finish. And testimony given by bank tellers, bank security management, and things like that.

Stubbs Br. at 21-26. The court ultimately allowed Stubbs to represent himself, but ordered defense counsel to serve as "stand by" counsel throughout the remainder of the trial.3 Id. at 26.

A.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have Assistance of Counsel for his defense." U.S. Const. amend. VI. The Supreme Court has construed this to mean that "the guiding hand of counsel" must be made available in criminal trials to those that can not afford to hire an attorney on their own. United States v. Ash, 413 U.S. 300, 308 (1973); Gideon v. Wainright, 372 U.S. 335, 340 (1963).

It is now clear, however, that the Sixth Amendment also guarantees the right of self-representation. The Supreme Court has recognized that that right is necessarily embodied in the Sixth Amendment, as "the Constitution does not force a lawyer upon a defendant." See Faretta v. California, 422 U.S. 806, 814 (1975), quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1943). In Faretta, the trial judge found that the criminal defendant had no constitutional right to conduct his own defense, and required court appointed counsel to conduct the defense instead. See Faretta, 422 U.S. at 808-09. On appeal, the defendant claimed that he had a Sixth Amendment right to conduct his own defense, and that the trial court's denial of that right required a new trial. The Supreme Court agreed, finding that the rights embodied in the Sixth Amendment "grant[] . . . [an] accused personally the right to make his defense." Id. at 819. The Court reasoned that although the Sixth Amendment was intended as a protection for the defendant, "thrust[ing] counsel upon the accused against his considered wish, . . . violates the logic of the Amendment." Id. at 820.

The Sixth Amendment thus embodies two competing
_____

3. As standby counsel, Cogan was instructed to sit at the table with Stubbs and make himself available in the event that Stubbs had any questions.

10

rights because exercising the right to self-representation necessarily means waiving the right to counsel. See Buhl v. Cooksey, 233 F.3d 783, 789 (3d Cir. 2000).

> It is axiomatic that a criminal defendant's waiver of a constitutional right must be voluntary, knowing and intelligent. Therefore, the constitutional right of self-representation in a criminal case is conditioned upon a voluntary, knowing and intelligent waiver of the right to be represented by counsel.

Buhl, 233 F.3d at 798. Further, "we do not presume acquiescence in the loss of fundamental rights." Johnson, 304 U.S. at 464, citing Ohio Bell Tel. Co. v. Public Utilities Comm'n, 301 U.S. 292, 307 (1937). Therefore, we"indulge every reasonable presumption against waiver" of the right to counsel. Id., citing Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393 (1937); Von Moltke v. Gillies, 332 U.S. 708, 723 (1948). Moreover, inasmuch as the right to counsel is fundamental to due process and the criminal justice system, its denial can never be harmless error. See United States v. Salemo, 61 F.3d 214, 222 (3d Cir. 1995), citing Chapman v. California, 386 U.S. 18, 23 & n.8 (1967).

In United States v. Welty, 674 F.2d 185 (3d Cir. 1982) we held that a court must undertake a two-prong inquiry when a defendant expresses a desire to either substitute counsel or proceed pro se on the eve of trial. The court must first determine if the accused can "show good cause[for dismissing counsel], such as a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict with his attorney." Welty, 674 F.2d at 188. However, "[i]f the reasons are made known to the court, the court may rule without more." Id., quoting Brown v. United States, 264 F.2d 363, 369 (D.C. Cir. 1959) (en banc) (Burger, J. concurring in part). We held that if good cause does exist, counsel should be dismissed "even though it may necessitate continuing the trial." Id. However, if the defendant does not establish good cause, the defendant then has to chose between proceeding pro se, or accepting counsel's representation and stewardship. Id.

Where, as here, a defendant only wants to proceed pro se and does not request substitute counsel, the first prong of

11

the inquiry takes on less significance. See Buhl , 233 F.3d at 798. However, the defendant's motives may still be relevant as they may shed light on whether the defendant's waiver has been made knowingly and intelligently. See id.

Here, the colloquy between the court and Stubbs shows that Stubbs wished to dismiss his counsel because Stubbs was dissatisfied with his attorney's performance, and because Stubbs wanted to address the jury directly. 4 Stubbs' request to proceed pro se came at a time when the trial was well underway; the prosecution had finished introducing evidence in its case-in-chief. Therefore, the circumstances here do not fit neatly into the parameters we discussed in Welty. Nevertheless, the guiding principles of Welty still assist our analysis of Stubbs' Faretta claim.

There is no issue here as to whether Stubbs "clearly and unequivocally" asserted his right to counsel as is required under the Sixth Amendment. Buhl, 233 F.3d at 792. After defense counsel informed the trial court that Stubbs wanted to represent himself, Stubbs then confirmed to the court: "I'm going to do my own thing. . . . I am going to represent myself as of now." When the court responded by reiterating that Stubbs was entitled to be represented by an attorney, Stubbs replied: "And I also know that I'm entitled to represent myself if I wish to." Stubbs' Br. at 22-23. This was clearly not a request for substitute counsel, and it was just as clearly and unambiguously an assertion of the right to self-representation under the Sixth Amendment. 5

This imposed a "serious and weighty responsibility upon the trial court [to determine] whether there[was] an intelligent and competent waiver by the accused." Buhl, 233

_____

4. As noted above, Stubbs told the court: "there's evidence that I want to admit[,]" Stubbs Br. at 22, and "I have some documents . . . FBI logs, things like that, that I want to refer to in basically my closing[.]" Id. at 23. He also told court: "There is no reason for me to testify if I'm representing myself. I can tell the jury what I want them to know from my own mouth." Id. at 24.

5. A defendant need not "recite some talismanic formula hoping to open the eyes and ears of the court to his request" to invoke his/her Sixth Amendment rights under Faretta. Buhl, 233 F.3d at 791, quoting Dorman v. Wainwright, 798 F.2d 1358, 1366 (11th Cir. 1986).

12

F.3d at 799. In Welty, and again in Buhl , we defined the inquiry that a trial court must undertake under these circumstances. We stated:

> the district court should advise [the defendant] in unequivocal terms both of the technical problems he may encounter in acting as his own attorney and of the risks he takes if his defense efforts are unsuccessful. The district court judge should tell the defendant, for example, that he will have to conduct his defense in accordance with the Federal Rules of Evidence and Criminal Procedure, rules with which he may not be familiar; that the defendant may be hampered in presenting his best defense by his lack of knowledge of the law; and that the effectiveness of his defense may well be diminished by his dual role as attorney and accused. In addition, as Justice Black wrote in Von Moltke v. Gillies . . . (t)o be valid (a defendant's) waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.

Welty, 674 F.2d at 188–89 (internal citations and quotations omitted) (emphasis added); see also Buhl, 233 F.3d at 799 (quoting Welty); Salemo, 61 F.3d at 220. We also stressed that "[p]erfunctory questioning is not sufficient." Welty, 674 F.2d at 799.

The specificity and care required of the trial court are dictated by the gravity of the defendant's actions in waiving the protections endemic in representation by skilled defense counsel:

> [w]hen an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must `knowingly and intelligently' forego those relinquished benefits. Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-

13

representation, he should be made aware of the
dangers and disadvantages of self-representation, so
that the record will establish that `he knows what he is
doing and his choice is made with eyes open.'

Faretta, 422 U.S. at 835 (citations omitted). A court should
only accept a waiver after making a searching inquiry
sufficient to satisfy the court that the defendant's wavier
was understanding and voluntary. Welty, 674 F.2d at 189;
McMahon v. Fulcomer, 821 F.2d 934, 942 (3d Cir. 1987);
Salemo, 61 F.3d at 220. Thus, a court ought not to accept
a waiver absent "a penetrating and comprehensive
examination of all the circumstances." Buhl , 233 F.3d at
799, quoting Welty, 674 F.2d at 189.

The court's inquiry here does not satisfy that standard.

B.

The district court did inform Stubbs of the technical
problems he faced in general. The court told Stubbs of the
problems that could arise under the Rules of Evidence and
Criminal Procedure, as well as the local court rules. The
court's comments to Stubbs included the following:

> You understand that if you make this decision,
> anything you do is subject to objection by counsel, and
> that if that objection is well taken, I might grant that
> objection. And that you are only entitled, as I have said
> several times, to represent yourself in accordance with
> the Rules of Criminal Procedure, the Rules of Evidence,
> the Rules of Court as they pertain to this case. You
> can't do whatever you want to if it is not legally
> permissible, if evidence is not legally admissible or
> legally competent.

Stubbs' Br. at 23. However, the court then asked Stubbs:
"Do you understand that?" and Stubbs replied:"No, not
really." Id. The court then tried to elaborate, but only
reiterated what it had already explained. The court said:
"Well, I'm telling you that. That you are not allowed to do
anything you want to because you want to do it. There are
rules of Evidence, . . ." Id. Stubbs then insisted that he
wanted to refer to some specific documents in his closing,

14

and the court properly told him that he could not refer to anything that was not in evidence. See id. However, Stubbs replied to that by insisting that that was the very reason that he wanted to "enter this stuff in evidence because there was just a bunch of lies told there was simply a bunch of lies told." Id. After hearing from the court that it was not the court's job to determine what were lies, Stubbs persisted: "Exactly, that's what I am saying. I have documentations that say they lied." Id. The court then shifted out of this verbal impasse and told Stubbs that he was not required to testify, that the government's evidence was already in, and "the only possible part of the trial would be your testimony which you would have to testify under oath if you chose to testify . . . But if you do testify, do you understand that you are subject to cross-examination. . . " Id. at 24.

The court's summary of the phases of the trial that remained did not inform Stubbs of the possibility of rebuttal and sur rebuttal. However, there is a far more glaring and substantive omission. It is obvious from the exchange between Stubbs and the court that Stubbs wanted to proceed pro se so he could bring certain matters to the attention of the jury and address the jury directly, thereby avoiding the need of testifying under oath. Yet, it is clear that Stubbs never understood that proceeding pro se would not allow him to inform the jury of anything that he could not also inform the jury of if represented by counsel. The court did explain that Stubbs would be limited by the Rules of Evidence but it is clear from the exchange that Stubbs believed he would have certain evidentiary advantages by proceeding pro se. Moreover, Stubbs clearly told the court that he did not understand what the court was saying about the Rules of Evidence and Procedure when the court tried to elaborate, and the court never attempted to explain in terms that Stubbs would understand.6

_____

6. Of course, it may be that Stubbs really did understand and was simply being obstinate. However, we can not conclude that on this record. Moreover, a court must take care that a purported waiver of the Sixth Amendment is knowing and voluntary, even if the defendant is

15

The court did attempt to elaborate upon how the Rules of Evidence and Procedure could limit Stubbs in presenting a defense. The court told Stubbs: "So if there hasn't been sworn testimony of those facts in evidence, you are going to be precluded from arguing that to a jury. Because a person who closes can only argue the evidence. That's what a closing argument is. A person argues --." Stubbs' Br. at 25. Stubbs then apparently tried to obtain some clarification by asking: "So you are saying to me --" However, the court responded: "Excuse me, you will allow me to finish," id. at 25, and continued explaining that Stubbs could not speak to the jury. However, the court did not respond to Stubbs' concern in a manner that was sufficiently clear to allow us to conclude that Stubbs fully understood what he was doing. In fact, after this exchange, Stubbs simply replied: "Listen, again, I'm saying that there are certain lies that I know have been told from certain FBI logs, do you understand what I'm saying?" Id. The Court told Stubbs it did not understand and Stubbs (not to be outdone by the court's admonition to not interrupt) replied: "If you would let me finish;" and continued his discussion about the bank tellers. Defense counsel was then given a moment with Stubbs, and the exchange appears to have concluded at that point.7 Id. at 26.

In addition, the court also failed to warn Stubbs of the disadvantages and pitfalls of playing the dual role of attorney and accused. Other than mentioning the potential procedural problems, the record is devoid of the kind of warnings that we have previously found sufficient to accept

_____

being obstinate. See Welty, 674 F.2d at 189. ("While we can understand, and perhaps even sympathize, with the frustration and exasperation of the district court judge, even well-founded suspicions of intentional delay
and manipulative tactics can provide no substitute for the inquiries necessary to protect a defendant's constitutional rights.")

7. Nothing further appears in the Appendix or Stubbs' Brief, and the Government has not provided us with any additional excerpts from the trial transcript to establish that the court conducted any further inquiries. Accordingly, we presume that what we have set forth constitutes the entire exchange between the court and Stubbs on the issue of his waiver of counsel.

16

a waiver of defense counsel. See e.g. Gov't of the Virgin Islands v. James, 934 F.2d 468, 472 n.5 (3d Cir. 1991) (upholding defendant's waiver of counsel where the trial judge warned the defendant that "a person who has himself for a lawyer is a fool[.]").8

As the trial judge did not properly advise Stubbs of the pitfalls of self-representation, we conclude that the trial court's colloquy with Stubbs does not satisfy the minimum standards of Faretta. We can not conclude that Stubbs "kn[ew] what he [was] doing and his choice [was] made with eyes open." Faretta, 422 U.S. at 835, quoting Adams, 317 U.S. at 279. Accordingly, we hold that Stubbs' waiver of counsel was not made knowingly and intelligently. 9

The fact that the trial court instructed Mr. Cogan to serve as standby counsel for the remainder of the trial does not change our analysis. Nowhere in Faretta or our pronouncements in Welty do we suggest that the presence of standby counsel would alter our analysis of the facts on this record. Stubbs did not request co-counsel; he requested to act as his own counsel. In certain circumstances, the appointment of standby counsel may even be incongruous with the exercise of the right to self-representation. See e.g. Buhl, 233 F.3d at 802 (finding the hybrid representation of standby counsel and the defendant's exercise of the right to represent himself

_____

8. We realize, of course, that this precise language will often only add fuel to the fire and we do not in any way suggest that a court must inform a defendant of the pitfalls of self representation in these words. We merely mention James by way of example of the types of problems a court must inform the accused of when deciding whether to accept a waiver of counsel.

9. We reject Stubbs' argument, however, that he was not adequately informed of the nature of the charges and the range of punishments against him. Although the trial judge did not specifically advise Stubbs to that effect, Stubbs had previously been advised on these matters at the Initial Appearance, see App. at 5, the Detention Hearing, see App. at 71, as well as at his Arraignment, see App. at 77-78. This court has previously upheld a waiver of counsel as valid where the trial judge failed
to tell the defendant the nature of charges and range of penalties, but the defendant had already been reminded of this information on two prior occasions. See McFadden, 630 F.2d at 972.

17

"inconsistent with the core of the constitutional right that [the defendant] was attempting to assert."). In any event, the record submitted on appeal here does not suggest that standby counsel played any part in aiding Stubbs during the remainder of the trial or ameliorating the disadvantages Stubbs would naturally face as both counsel and accused.

The government argues that since the trial was almost over when Stubbs asked to represent himself, the potential dangers of self-representation were markedly reduced. First of all, we reject this argument because it assumes that defense counsel did not have much more to present in response to the government's case. Although that may or may not be true, we have not been shown anything on this record to support that supposition.

More importantly, however, this argument fails because it suggests that any error in the court's colloquy was harmless. The government is suggesting that since Stubbs enjoyed the protections of representation throughout most of the trial, there is little chance that he was prejudiced by taking over after nearly all evidence against him was admitted. However, that is nothing more than an invitation to engage in the harmless error analysis that the Supreme Court has rejected in the context of a Sixth Amendment waiver of counsel.

> Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to "harmless error" analysis. The right is either respected or denied; its deprivation cannot be harmless.

McKaskle v. Wiggins, 465 U.S. 168, 177 (1984).[10]

_____

10. Of course, we do not suggest that a defendant can wait until the last question is asked of the last witness and then attempt to proceed pro se in order to sabotage a criminal proceeding. A defendant who seeks only to sabotage a criminal proceeding is not clearly and unequivocally waiving his/her right to counsel, and trial courts can prevent such tactics from succeeding by relying upon information gained during the inquiry required under Welty. We caution, however, that trial courts must be careful to avoid allowing the timing of a purported waiver to necessarily define the defendant's sincerity in requesting it.

18

III. The Probable Cause Issue

Stubbs also argues that the FBI agents lacked probable cause for the warrantless arrest and that the physical evidence that was seized is tainted by an illegal search. The district court denied Stubbs' motion to exclude the informant's tip, and then found that the tip, in conjunction with the activity observed during the surveillance, constituted probable cause to arrest. The court held that the car was validly searched incident to a valid arrest and that the physical evidence derived from that search was therefore admissible. Inasmuch as this may be an issue on remand, we will address Stubbs' challenge to the physical evidence. Our review of the district court's legal determinations as to the legality of the seizure of the evidence is plenary. See Ornelas v. United States, 517 U.S. 690, 697 (1996); United States v. Harple, 202 F.3d 194, 196 (3d Cir. 1999).

Police have probable cause to arrest if the circumstances are sufficient to cause a prudent person to believe that a crime has been committed and the person to be arrested committed it. See Beck v. Ohio, 379 U.S. 89, 91 (1964); Paff v. Kaltenbach, 204 F.3d 425, 436 (3d Cir. 2000). Probable cause is determined by the "totality of the circumstances." Illinois v. Gates, 462 U.S. 213, 230-31 (1983); Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997). We must assess the "knowledge and information which the officers possessed at the time of arrest, coupled with the factual occurrences immediately precipitating the arrest" in determining if probable cause existed. United States v. Harris, 482 F.2d 1115, 1117 (3d Cir. 1973)."[P]robable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules." Paff, 204 F.3d at 436, quoting Gates, 462 U.S. at 436.

A failure on the part of law enforcement to obtain a warrant does not necessarily invalidate an arrest. The Supreme Court has held that where an automobile is involved, exigent circumstances exist that overcome the general warrant requirement due to the automobile's"ready mobility." See Pennsylvania v. Labron, 518 U.S. 938, 940 (1996), citing California v. Carney, 471 U.S. 386, 390-91

19

(1985); see also United States v. Bivens, 445 F.2d 1064, 1069 (3d Cir. 1971) (upholding warrantless arrest of defendant traveling in an automobile where probable cause existed to arrest). Further, an individual has a reduced expectation of privacy in an automobile due to its pervasive regulation. See Labron, 518 U.S. at 940, citing Carney, 471 U.S. at 393.

In light of these legal principles, Stubbs' challenge to the physical evidence does not merit much discussion. An informant told the FBI that a bank was going to be robbed, and that Brown was going to rob it. Although this alone would fall woefully short of probable cause no matter how reliable the informant, there is more. The tip was corroborated by the surveillance of Brown. As noted above, the agents followed Brown and his companions as they circled blocks, drove around banks without going in, and put on ski masks while parked in the parking lot near one of the banks. At that point, the agents could fairly conclude that Brown and his companions had not gotten lost on the way to a downhill slalom competition. They could reasonably assume that the ski masks were going to be used in a bank robbery, just as the informant had predicted.

On October 7, the agents lost sight of the three men 23 minutes before the Dollar Bank robbery. The car in which the three men were traveling was only five or six miles from that bank when agents lost sight of it. The robbery reported at the bank was a "takeover" style robbery that was consistent with the robbery that had occurred earlier at the PNC Bank on Frankstown Road. Agents had been told that Brown was involved in that robbery as well. The totality of what the agents were told, and what they confirmed with their surveillance, along with the proximity of the Dollar Bank to where Brown was last seen, clearly established probable cause to arrest Brown as well as the two men with him. Stubbs was one of those two men. The fact that Brown and the two men were traveling in an automobile provided the exigent circumstances to arrest without a warrant. See Beck, 379 U.S. at 91.11

_____

11. The agents performed a search of the Chevrolet pursuant to the arrest of the three men and recovered a number of items, including a

20

IV. Conclusion

For the reasons set forth above, the convictions and judgment of sentence are reversed and this case is remanded to the district court for a new trial. 12

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit
Kaufmann's shopping bag full of money, ski masks, gloves, and handguns. The agents did not have a search warrant."When a warrantless search is made pursuant to an arrest,`the constitutional validity of the search. . . must depend upon the constitutional validity of
the . . . arrest.' " United States v. Kithcart, 134 F.3d 529, 531 (3d Cir. 1998), quoting Beck, 379 U.S. at 91. As we find the arrest here valid, we also find that the search incident to the arrest was also valid.

12. Stubbs also appeals the district court's enhancement of his sentence on Count IV on the grounds that the enhancement runs contrary to the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000). This argument is meritless. Apprendi makes clear that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for
a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." See Apprendi, 530 U.S. at 490 (emphasis added). Stubbs' sentence was enhanced by a prior conviction, and thus Apprendi does not apply. See United States v. Weaver, 267 F.3d 231, 251 (3d Cir. 2001).