

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-21-2002

# USA v. Peppers

Precedential or Non-Precedential: Precedential

Docket No. 01-2348

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Peppers" (2002). *2002 Decisions.* Paper 527.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/527

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 21, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2348

UNITED STATES OF AMERICA

v.

RONNIE PEPPERS,
        Appellant

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 00-cr-00105)
District Judge: Honorable Sylvia H. Rambo

Argued: March 4, 2002

Before: ALITO, RENDELL, and HALL,*
Circuit Judges

(Filed: August 21, 2002)

        Daniel I. Siegel, Esq. [ARGUED]
        Office of Federal Public Defender
        100 Chestnut Street, Suite 306
        Harrisburg, PA 17101
         Counsel for Appellant

_____

* Honorable Cynthia Holcomb Hall, Senior Judge of the United States
Court of Appeals for the Ninth Circuit, sitting by designation.


        Theodore B. Smith, III, Esq.
         [ARGUED]
        Office of United States Attorney
        Federal Building, Suite 220
        228 Walnut Street
        P.O. Box 11754
        Harrisburg, PA 17108
         Counsel for Appellee

OPINION OF THE COURT

RENDELL, Circuit Judge.

On November 28, 2000, a federal jury found Ronnie
Peppers guilty of the first degree murder of a drug dealer,
Jorge ("Cuban George") Drake, conspiracy to distribute and
possess with the intent to distribute controlled substances,
use of a firearm during and in relation to a drug trafficking
crime, and being a felon in possession of a firearm. Before
us, Peppers raises three allegations of error: that the

prosecution failed to adduce sufficient proof of all of the elements of the alleged crimes, that the District Court erred in not allowing Peppers to proceed pro se after he requested to do so, and that the District Court erred in its determination that the victim's identification of his assailant was not admissible as a dying declaration. For the reasons set forth below, we find Peppers' challenge to the sufficiency of the evidence to be without merit. We do, however, agree with Peppers that the District Court erred in its handling of his request to proceed pro se . We will accordingly remand for a new trial. Additionally, we find that the District Court had the discretion to admit or preclude the proffered statement of identification, and, while perhaps it could have expressed the basis for its ruling more clearly, we do not find that it abused its discretion in refusing to admit the out of court statement.

I. Statement of Facts

Lisa Watson lived with her mother in Harrisburg. Her brother, John, lived close by. On August 13, 1997, at

2

approximately 2:00 a.m., Jorge Drake was taking Lisa Watson home, and had stopped the car near her residence. A man wearing a black ski mask and dark clothing approached the driver's window and shot Drake in the head at close range, causing blood and brain matter to spatter upon Lisa Watson, who was sitting in the front passenger seat. According to eyewitnesses, the shooter reached into the car and removed something, yelled to Lisa Watson to get out, and then ran away. Drake did not die immediately. In fact, later that night, though heavily sedated and partially paralyzed, he responded to an inquiry as to who shot him with the single word, "Jun."[1] When subsequently asked by police who Jun was, Drake stated that he was "his boy," but refused to provide further details. Drake's ex-wife told police that, on the day after he was shot, Drake told her that John Watson had shot him. Another person who visited Drake in the hospital also told police that Drake had said "Juney and John" when asked who shot him.[2] Although it appeared that Drake might recover, after being transferred to a rehabilitation facility he died from his injuries on September 10, 1997. Peppers was charged in a seventeen count indictment, and he pled not guilty to the offenses charged. On October 20, 2000, Peppers wrote to the District Court, requesting permission to file a pro se interlocutory appeal and to represent himself. He also requested a hearing to address his requests. The District Court responded by letter on October 25, 2000,[3] stating only:

> Please be advised that your correspondence to me dated October 20, 2000, has been forwarded to your counsel of record. I do not entertain motions, or requests that could be deemed motions, from litigants who are represented by counsel.

1. Counsel has informed us that "Jun" is pronounced "June."

2. It is not clear from the record whether Drake said "Juney" and "John" or "Juney and John." For the purposes of our analysis the distinction is immaterial.

3. Although the letter is dated October 25, 2000, it was docketed September 24, 2001.

3

On November 2, 2000, Peppers was arraigned on the Second Superseding Indictment, and a hearing was held on Motions in Limine by the government to exclude Drake's statements identifying "Jun" as the person who shot him. During the course of that hearing, the government represented that it had been unable to locate Drake's ex-wife, Josephine Williams, one of the persons to whom Drake had identified the shooter. Shortly thereafter, Peppers' counsel indicated that Peppers desired to address the Court. The following exchange took place.

> Mr. Welch: Mr. Peppers has asked that he be allowed to address the Court. As Your Honor is aware, he sent a letter to the Court asking to be able to proceed pro se. I have no idea what he wants to speak to right now, Your Honor.
>
> The Court: Go ahead, Mr. Peppers.
>
> Mr. Peppers (misidentified in the transcript as Mr. Welch): I just wanted to speak not to the letter, but with reference to some of the witnesses. I wanted to speak in reference to Josephine Williams and some other witnesses that they are looking for.

On November 6, 2000, just before jury selection was to begin, Peppers orally requested to proceed pro se. The District Court proceeded with jury selection and then conducted a colloquy with Peppers. On November 15, the District Court issued a written order denying Peppers' oral request. On November 16, the District Court granted the government's motion in limine to exclude Drake's statements. On November 20, trial began.

The witnesses at trial included -- among others-- Lisa Watson, the two persons who were with Peppers the night of the murder, one of whom claimed to be his lookout,[4] and two neighbors who were eyewitnesses to the shooting. The identification testimony was not entirely consistent. Testimony was also presented that Drake had been a drug dealer who dealt in "ass kicker" heroin, and that Peppers

_____

4. After the preliminary hearing and prior to trial, Waters, the person claiming to be his lookout, died. The preliminary hearing testimony was read into the record at trial.

was also a drug dealer, dealing primarily in crack cocaine. The thrust of Peppers' defense was that, while he was in the vicinity of the shooting at the time in question, he did not commit the murder. Peppers was convicted on all counts, and was sentenced to life imprisonment plus five years. He filed a timely appeal.

## II. Statement of Jurisdiction

The District Court had jurisdiction pursuant to 18 U.S.C. S 3231. Because Peppers is appealing from a final judgment of conviction, we have jurisdiction pursuant to 28 U.S.C. S 1291.

## III. Peppers' Claims on Appeal

### A. Sufficiency of the Evidence as to Each Element of the Crime

#### 1. Standard of Review

We apply a "particularly deferential" standard of review to a challenge to the sufficiency of evidence supporting a jury verdict. United States v. Cothran, 286 F.3d 173, 175 (3d Cir. 2002) (quoting United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998)). If "any rational juror" could have found the challenged elements beyond a reasonable doubt, viewing the evidence in the manner that is most favorable to the government, neither reweighing evidence, nor making an independent determination as to witnesses' credibility, we will sustain the verdict. Id. Further, Peppers concedes that he did not preserve an objection to the sufficiency of the evidence. We will therefore examine the record only for plain error. United States v. Wolfe, 245 F.3d 257, 260-61 (3d Cir. 2001) (citing United States v. Turcks , 41 F.3d 893, 898 (3d Cir. 1994)). Thus, Peppers must establish that the error prejudiced the jury's verdict, and even if it did, we may -- but are not mandated -- to correct the error. Turcks, 41 F.3d at 897. In determining whether to correct the error, we consider the impact of the error on the "fairness, integrity or public reputation of judicial proceedings." Id. We do not need to go so far here, however, for we find that there is evidence -- though not

overwhelming or entirely consistent -- from which the jurors could have found each element of the challenged offense.

#### 2. Discussion

The government's charge that Peppers violated S 924(j) (Count I of the Second Superseding Indictment) alleged that he

did intentionally and knowingly unlawfully cause the death of Jorge Drake through the use of a firearm that the defendant, Ronnie Peppers, used and carried during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, that is conspiracy to distribute and possess with the intent to distribute controlled substances.

Peppers now claims that even if the evidence at trial permitted the jury to find that Peppers shot and robbed Drake, there was no evidence that the killing was in any way related to a conspiracy to distribute or to possess with the intent to distribute controlled substances. There was abundant testimony in the record that Peppers was a drug dealer.[5] But Peppers argues that the government's strongest evidence that he ever conspired with someone to distribute controlled substances related to events that took place after Drake had died, namely, a purported agreement between Peppers and David Miller to distribute crack cocaine to a person in Lancaster in November 1997. There was no testimony presented to link Miller to Drake. However, Miller testified that Peppers had provided him with substances for distribution over the course of six months, even though the only testimony about an express agreement between the two to distribute controlled substances occurred in November 1997. We have little difficulty concluding that the jury could infer from Miller's testimony that an agreement to distribute with Miller had been in effect for some time prior to Drake's death. Further, and perhaps more importantly, there was evidence directly related to a

_____

5. For example, Detective Heffner testified at trial that during an interview with Peppers, Peppers had stated "that he was selling drugs during this time, that he was selling a lot of drugs."

conspiracy with Waters, the lookout during Drake's shooting, to distribute controlled substances on the night in question. Waters testified at a preliminary hearing prior to his death, so the preliminary hearing testimony was read into the record at trial. He testified that he and Peppers had seen Drake on the afternoon of Drake's death, and Peppers had arranged for Waters to act as lookout while Peppers robbed Drake. On cross-examination, Waters was asked what Peppers said to him specifically. He replied,"I'm going to do a stick-up, watch my back, you get half the money and the drugs." Also on cross-examination, Waters testified that Peppers was going to "hit" Drake that night, and that "hit means rob." When asked if details were discussed, Waters replied: "Just rob him, take his drugs." In his direct testimony, Waters stated that after the murder, Peppers gave him "three bags of crack." On cross-examination, the following exchange took place:

Q All you got out of it was some crack cocaine?

A Yeah.

Q Did you see that crack cocaine?

A I tricked with it.6

Q How much was it worth?

A $60.

Q Is that all you got out of this?

A Yeah.

Q So a man was killed and all you got out of it was $60?

_____

6. At trial, the attorneys held a conversation at sidebar that reflected two different understandings of the term "tricked" in Waters' testimony. Defense counsel indicated that he had interpreted the phrase as referring to Waters' attempt to "solicit the affections" of the young woman who was in the car with Peppers and Waters. The prosecution stated that he would "clarify this through Detective Heffner. When Michael Waters referred to tricking, my understanding is he was referring to doing drugs with somebody as opposed to being involved in some sort of amorous situation." The meaning of "tricking" was not clarified in Heffner's subsequent testimony.

A Yes, sir.

The two neighborhood eyewitnesses both testified that they saw the shooter reach into the car and remove something. This testimony would clearly support a finding that one of the purposes of the robbery was to take drugs, that Peppers had promised Waters that he would share the proceeds from the robbery with him, and that Peppers had taken drugs from Drake, had given part of those drugs to Waters, and Waters had in turn sold those drugs for $60. Thus, we find that any rational juror could have found that Peppers caused Drake's death "intentionally and knowingly unlawfully . . . through the use of a firearm that[he] used and carried during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, that is conspiracy to distribute and possess with the intent to distribute controlled substances." Accordingly, Peppers' challenge to the sufficiency of the evidence is without merit.

B. Should Peppers Have Been Allowed to Proceed pro se?

1. Standard of Review

As the issue is whether there was a knowing and intelligent waiver, the legal conclusion as to whether the record so indicates is subject to plenary review. United States v. Stubbs, 281 F.3d 109, 113 n.2 (3d Cir. 2002) (citing Virgin Islands v. Charles, 72 F.3d 401, 404 (3d Cir.

1995)). As we recognized in Charles, when our review is as to facts found by the Court, we employ clearly erroneous review. 72 F.3d at 404 (citing Miller v. Fenton , 474 U.S. 104, 112 (1985)). The right of a defendant to represent himself is structural; as such, "its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless." McKaskle v. Wiggins, 465 U.S. 168, 177 n.8 (1984).

2. Discussion

Peppers claims that he raised the issue of proceeding pro se three times: on October 20, 2000, in his letter to the court; on November 6, 2000, just prior to jury selection;

and in his post-trial motions. In his October 20 letter, Peppers stated:7

>     (1) After numerous unsuccessful attempts to get my attorney, Allen Welch, to have client/attorney consultation meetings with me, so that we can prepare for trial and have, if not, a effective defense, then at least an adequate defense. Mr. Welch, however, did finally meet with me on the above mentioned date, which is hardly adequate to prepare for trial which commence in two weeks, November 6, 2000.
>
>     (2) Defendant and counsel have numerous conflicts of interest, from unfiled requested Pre-Trial motions, motions to the court for release of evidence that is in the custody of the government for forensic testing, requested exhibit's for trial, to counsel's refusal to seek permission from the court to file a interlocutory appeal of the courts ruling.
>
>     (3) Counsel failing to keep defendant informed of the status of his case so that defendant can make intelligent decisions concerning general strategy, and informed decisions regarding the representation.
>
>     (4) Counsel failing to inform defendant of any motions submitted to the court in defendants behalf and/or consult with defendant prior to the filing of Pre-Trial motions.
>
>     (5) Counsel failing to submit requested Pre-Trial motions in defendants behalf.
>
>     (6) So defendant can locate witness' where counsel, thus far has made no effort to locate/interview defense witness' that are on the defense witness list that was supplied to counsel by defendant.
>
>     Finally, defendant request that the court conduct a hearing consistent with this correspondence, permit defendant to file a Pro Se, interlocutory appeal, and/or permit defendant to represent himself.

7. The text has been replicated precisely as it appeared in the original.

> that it would not be in the interest of justice to conduct court when such issue's are before the court, and when counsels competence is in question.

(Emphasis added).

The Court responded to Pepper's letter by forwarding it to his counsel, and writing to Peppers, informing him that it would not entertain "motions, or requests that could be deemed motions from litigants who are represented by counsel." On November 2, Peppers' counsel -- but not Peppers himself -- raised the issue of Peppers' proceeding pro se. Through his counsel, Peppers reiterated his desire to proceed pro se on November 6, 2000, just prior to jury selection. The following interchange took place at sidebar.

> Mr. Welch: Mr. Peppers just this instant came in and sat down beside me and said he wants to represent himself.
>
> The Court: No, he is not going to.
>
> Mr. Welch: I understand.
>
> The Court: Tell him he can raise the matter again after I have finished jury selection. I have another one after this. I don't want to do it in front of the panel. I need to put a colloquy on the record.
>
> Mr. Welch: I understand.

After dismissing prospective jurors for lunch, the following colloquy took place.

> The Court: Mr. Peppers, your counsel indicated that you told him that you preferred to proceed in this proceeding pro se. That is without counsel. Do you still wish to advise the Court as to whether this is your position?
>
> The Defendant: Yes, it is, Your Honor.
>
> The Court: Mr. Peppers, you have some very, very serious charges against you in this matter. You have had no experience in doing this before. Conspiracy is a complicated matter. So is the killing of an individual in the course of a drug transaction.

You also have a lot of witnesses that the government needs to obtain on your behalf. He is out there able to do that. You are confined. You will have every opportunity to convey your wishes to Mr. Welch, to present questions to him to present to the jury.

 You may place on the record your request. Do you want to put it on the record now?

The Defendant: To represent myself?

The Court: Yes.

The Defendant: Yes, I would like to do that.

The Court: Put the microphone in front of you, please. I need to know why.

The Defendant: Why?

The Court: Yes.

The Defendant: Well, a lot of the details with a lot of the pretrial issues, I felt didn't get done. And I felt that those areas were neglected. Therefore, I am not sure about my defense being neglected.

The Court: What in this case has been neglected, and how do you presume you will be able to rectify it?

The Defendant: Well, I feel that I can best serve my defense by me questioning the witnesses. I don't believe that Mr. Welch knows what type of information to cross-examine to elicit from these witnesses.

The Court: Why is that? Have you told him what to elicit?

The Defendant: I haven't seen --

The Court: Wait a minute. Wait a minute. Go ahead.

The Defendant: I haven't seen my attorney. I haven't seen him. None of my correspondence was responded to. I don't know exactly where my defense lies and exactly what strategies are going to be used for my defense.

The Court: Well, this case is scheduled for the 20th. There are two weeks in between. I am directing Mr.

11

Welch to sit down with you and go over the strategy that he intends. You can certainly supply him with the questions that you want him to address to your witnesses.

 You will have the opportunity while you are sitting

there at trial to present -- you will have a pad and paper. You can pass over to him questions. Of course, it is up to him to decide whether or not the question is relevant and whether or not it would be objected to.

Do you understand that?

At the Court's prompting, Peppers listed other areas of dissatisfaction with his attorney, including the failure to test evidence, to prepare a map as a trial exhibit, to file a pretrial motion challenging Count VII, and to file an interlocutory appeal of the Court's refusal to admit Drake's statements. The Court discussed these areas with Peppers and his counsel, and then stated:

The Court: All right. I will take his motion under advisement. It is not likely to be granted. I will let you know today. Court is in recess until two o'clock.

On November 14, the District Court issued an order denying Peppers' "oral motion" to represent himself. After summarizing the colloquy, the Court concluded that because Defendant had "no legal training or expertise," and since, at the time of the Court's determination, there was less than one week before trial, Peppers' request would be denied. The Court noted that "to allow Defendant to represent himself is equivalent to allowing him to stand trial with no representation at all."

On post-trial motions, Peppers again raised the issue of the denial to proceed pro se. The Court prefaced its statement by noting that "there was never a formal motion presented." It further noted that since Peppers had not pursued the issue at the November 2 hearing, "there was no basis for the court to grant the request."

We conclude that the District Court misapprehended the nature of its duty in response to Peppers' initial request to proceed pro se. Its responsibility was to assess whether the defendant's assertion was unequivocal, and, if so, whether

12

his waiver of his constitutional right was done voluntarily, knowingly, and with an understanding of the ramifications and consequences. We view this aspect of a district court's duty to be very important and challenging, yet one as to which there is little guidance. We write so as to explore this issue based on our caselaw.

a. The Nature of the Right

The right to counsel embodied within the Sixth Amendment carries as its corollary the right to proceed pro se. These rights are both respected within our jurisprudential tradition, although, since a person cannot secure the right to proceed pro se without sacrificing the right to counsel, we have required defendants to assert the right to proceed pro se affirmatively and unequivocally, and

we have placed on the court the burden of establishing that the defendant who does so acts voluntarily, and that he understands both the scope of the right sacrificed and the restrictions and challenges that he will face. Peppers has asserted the right to proceed pro se.

As the Supreme Court explained in the seminal case in this area, Faretta v. California, 422 U.S. 806, 820 (1975), the Sixth Amendment

> speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant-- not an organ of the State interposed between an unwilling defendant and his right to defend himself personally.

Id. "An unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense."8

---

8. Despite this broad language, however, the District Court's characterization of defendant as "entitled to counsel of his own choosing" is not completely accurate. See, e.g., Wheat v. United States, 486 U.S.

Id. at 821. Thus, a defendant who chooses to represent himself must be allowed to make that choice, even if it works "ultimately to his own detriment." Id. at 834.

In Faretta, the court had initially, though reluctantly, allowed the defendant to proceed pro se, but reserved the right to revoke Faretta's "privilege" to represent himself if "it later appeared that Faretta was unable adequately to represent himself." Id. at 808, 811 n.4. After querying the defendant as to the number of exceptions to the hearsay rule and the number of and grounds for challenging jurors for cause, the court concluded that "the ends of justice and requirements of due process require that the prior order permitting the defendant to represent himself in pro per should be and is hereby revoked." Id. at 811 & n.4.

Noting that the right of self-representation "has been protected by statute since the beginnings of our Nation," the Supreme Court found that the right of self-representation was supported by both the structure of the Sixth Amendment itself and the jurisprudence that gave rise to it. Id. at 812, 818. It specifically rejected the trial court's paternalistic determination that it should ensure that the defendant was capable of defending himself well in order to be allowed to defend himself.

We need make no assessment of how well or poorly

> Faretta had mastered the intricacies of the hearsay
> rule and the California code provisions that govern
> challenges of potential jurors on voir dire. For his
> technical legal knowledge, as such, was not relevant to
> an assessment of his knowing exercise of the right to
> defend himself.

Id. at 836.

The Court noted approvingly that Faretta's request was
made "weeks" before trial and was clear and unequivocal,

_____

153, 159 (1988) ("Thus, while the right to select and be represented by
one's preferred attorney is comprehended by the Sixth Amendment, the
essential aim of the Amendment is to guarantee an effective advocate for
each criminal defendant rather than to ensure that a defendant will
inexorably be represented by the lawyer whom he prefers.").

14

and that it was evident from the record that Faretta was
"literate, competent, and understanding." Id at 835.

   b. The Responsibility of the Court

It is the tension between the right to have counsel and
the right to represent oneself that places upon the trial
court the weighty responsibility of conducting a sufficiently
penetrating inquiry to satisfy itself that the defendant's
waiver of counsel is knowing and understanding as well as
voluntary. The Supreme Court's jurisprudence reflects a
long tradition of concern for persons haled into a legal
system that they cannot understand and in need of
assistance to help them navigate. See, e.g., Von Moltke v.
Gillies, 332 U.S. 708, 720 (1948). But requiring a trial court
to be particularly vigilant when a defendant waives his right
to counsel even predates Von Moltke.

> This protecting duty imposes the serious and weighty
> responsibility upon the trial judge of determining
> whether there is an intelligent and competent waiver by
> the accused. While an accused may waive the right to
> counsel, whether there is a proper waiver should be
> clearly determined by the trial court, and it would be
> fitting and appropriate for that determination to appear
> upon the record.

Johnson v. Zerbst, 304 U.S. 458, 465 (1938). Citing to
Zerbst, the Von Moltke Court stressed that the discourse
with the defendant is not "a mere procedural formality" but
that it requires a judge to

> investigate as long and as thoroughly as the
> circumstances of the case before him demand. The fact
> that an accused may tell him that he is informed of his
> right to counsel and desires to waive this right does not
> automatically end the judge's responsibility. To be valid
> such waiver must be made with an apprehension of the

nature of the charges, the statutory offenses included
within them, the range of allowable punishments
thereunder, possible defenses to the charges and
circumstances in mitigation thereof, and all other facts
essential to a broad understanding of the whole matter.
A judge can make certain that an accused's professed

15

waiver of counsel is understandingly and wisely made
only from a penetrating and comprehensive
examination of all the circumstances under which such
a plea is rendered.

This case graphically illustrates that a mere routine
inquiry -- the asking of several standard questions
followed by the signing of a standard written waiver of
counsel -- may leave a judge entirely unaware of the
facts essential to an informed decision that an accused
has executed a valid waiver of his right to counsel.

Von Moltke, 332 U.S. at 723-24.9

As far back as 1965 -- ten years prior to Faretta -- we
also began to articulate the scope of the court's
responsibility when a defendant seeks to proceed pro se,
drawing upon Von Moltke. See United States v. Washington,
341 F.2d 277, 285 (3d Cir. 1965). We have refined those
requirements to reflect the obligations placed upon the
district court through Faretta and its progeny.

---

9. Since Faretta, the Court has revisited various aspects of self-
representation on several occasions. E.g., In re Little, 404 U.S. 553, 555
(1972) (A defendant who represents himself is "entitled to as much
latitude in conducting his defense as we have held is enjoyed by counsel
vigorously espousing a client's cause."); McKaskle v. Wiggins, 465 U.S.
168, 177 (1984) (providing guidance on trial court discretion to utilize
standby counsel, and clarifying that "In determining whether a
defendant's Faretta rights have been respected, the primary focus must
be on whether the defendant had a fair chance to present his case in his
own way. Faretta itself dealt with the defendant's affirmative right to
participate, not with the limits on standby counsel's additional
involvement."); Patterson v. Illinois, 487 U.S. 285, 293 (1988) (permitting
a simplified waiver of counsel for post-indictment questioning); Godinez
v. Moran, 509 U.S. 389, 399-400 (1993) (holding that the standard for
competency to stand trial is the same as the standard to plead guilty or
to waive counsel, except that a person seeking to waive a constitutional
right must also demonstrate that the waiver is knowing and voluntary;
holding further that the competency at issue is the competency to waive
the right, not the competency to perform as counsel.); Martinez v. Court
of Appeal of California, Fourth Appellate Dist., 528 U.S. 152, 154 (2000)
(finding the right of self-representation on direct appeal not mandated by
the United States constitution).

16

In skeletal form, the requirements are these.

1. The defendant must assert his desire to proceed pro se clearly and unequivocally. See, e.g. , Buhl v. Cooksey, 233 F.3d 783, 791 (3d Cir. 2000).10

2. The court must inquire thoroughly to satisfy itself that the defendant understands "the nature of the charges, the range of possible punishments, potential defenses, technical problems that the defendant may encounter, and any other facts important to a general understanding of the risks involved." Charles , 72 F.3d at 404.

3. The court must "assure itself " that the defendant is competent to stand trial. Id.11

Because a request to dismiss counsel just before (or during) trial may well require a continuance, our court has also developed a "good cause" test, whereby a court confronted with a time-sensitive request to proceed absent current counsel should ascertain the defendant's reasons for his dissatisfaction with counsel. United States v. Welty, 674 F.2d 185, 187 (3d Cir. 1982). Accord, Virgin Islands v. James, 934 F.2d 468, 471 (3d Cir. 1991); Buhl, 233 F.3d at

---

10. We have determined that the Court's approval of Faretta's request as clear and unequivocal is in actuality a prerequisite for assertion of a right to self-representation. Buhl v. Cooksey , 233 F.3d 783, 792 (3d Cir. 2000). The Tenth Circuit Court of Appeals agrees."[W]e are persuaded that the right is one which the defendant must clearly and unequivocally assert before trial, as the accused did in Faretta. This is necessary because the trial court faces the difficult related problem of ascertaining whether there is an intelligent and voluntary waiver of the right to counsel." United States v. Bennett, 539 F.2d 45, 50 (10th Cir. 1976) (internal citations omitted). While requiring a clear and unequivocal request by the defendant, the First Circuit Court of Appeals places the burden on the court to elicit whether the request is clear and unequivocal: "it is generally incumbent upon the courts to elicit that elevated degree of clarity through a detailed inquiry." United States v. Proctor, 166 F.3d 396, 403 (1st Cir. 1999).

11. No question as to Peppers' competency to waive his right to counsel appears in the record; hence, we have no reason to address this aspect of the Faretta inquiry here. We note that this evaluation does not test one's legal competency to represent oneself.

17

798. If there is good cause, the court is required to grant a continuance and appoint new counsel, unless the defendant expressly wishes to proceed pro se. If the court does not find good cause, the court must inform the defendant that he can either proceed with current counsel, or represent himself. See, e.g., Welty , 674 F.2d at 187. If he indicates a desire to represent himself, the court must then conduct a Faretta inquiry. Id.

While the identification of the defendant's reasons for

wishing to dismiss his current counsel is more pertinent when substitute counsel is desired, we have noted that his reasons may also inform the knowing, understanding, and voluntary inquiry as well. Buhl, 233 F. 3d at 798-99; see also Stubbs, 281 F.3d at 117 (noting with respect to a mid-trial request to proceed pro se that "the defendant's motives may still be relevant as they may shed light on whether the defendant's waiver has been made knowingly and intelligently"); Jermyn v. Horn, 266 F.3d 257, 290 (3d Cir. 2001) (perceiving an assessment by the court of the defendant's intentions in seeking to take over his defense mid-trial as pertinent to a determination of whether his waiver of counsel was "knowing"); Charles , 72 F.3d at 404 (stating without elaboration that a court "must make an inquiry regarding the defendant's reasons for the request" as the first step in a Faretta inquiry). We note that every case in which we have iterated the "good cause" test has involved a request that is "on the eve of trial" or, as was the case in Stubbs, during trial.12

In sum, a district court cannot make an informed decision as to the knowing and voluntary nature of a defendant's request to proceed pro se without a thorough inquiry, on the record, to assure itself that the defendant

---

12. One request was made following trial. There, the defendant sought new counsel prior to his sentencing and in conjunction with a request for continuance -- after three earlier requests for a continuance of the sentencing date had already been granted. We mentioned the inquiry into reasons as one guideline "for conducting a proper inquiry following a defendant's request for substitution or waiver of counsel" but noted that the defendant had clearly expressed his reasons, thus relieving the court of any burden of inquiry. United States v. Salemo, 61 F.3d 214, 218, 221 (3d Cir. 1995).

18

fully apprehends the nature of the charges against him, the perils of self-representation, and the requirements that will be placed upon him. This calls for specific forewarning of the risks that foregoing counsel's trained representation entails. Once the court has fulfilled those responsibilities, however, if the defendant still elects to proceed pro se, the court must permit him to do so.

     c. The Court's Inquiry and Conclusions as to Peppers

As noted earlier, Peppers first mentioned the issue of proceeding pro se in a letter/motion to the Court on October 20, 2000, and his attorney referred to the matter again on November 2. The Court never dealt directly with the October 20 letter, referring the matter to counsel, and in its order of November 20 it seemed to downplay the import of its contents based on Peppers' conduct at the November 2 hearing.13 Whether or not the October 20 letter would have been sufficient to require the District Court to inquire about Peppers' desire to represent himself, the November 6 colloquy clearly sufficed. As the Eleventh

Circuit said in Dorman v. Wainwright:

> To invoke his Sixth Amendment right under Faretta a
> defendant does not need to recite some talismanic
> formula hoping to open the eyes and ears of the court
> to his request. Insofar as the desire to proceed pro se
> is concerned, petitioner must do no more than state
> his request, either orally or in writing, unambiguously
> to the court so that no reasonable person can say that
> the request was not made.

798 F.2d 1358, 1366 (11th Cir. 1986) (quoted in part in

_____

13. While referring the matter to counsel might be an appropriate
response to some direct correspondence from defendants, it seems
inappropriate when the defendant is confiding in the court about
difficulties he is experiencing with the very counsel the court chides him
for bypassing. Also, with respect to the November 2 hearing, the District
Court order seemed to characterize Peppers' failure to assert his desire
to represent himself as somehow reflecting equivocation. While not
necessary to our ruling on this issue, we think the District Court
overread Peppers' intent, given that the focus of the November 2 hearing
was on a different issue.

19

Buhl, 233 F.3d at 790 n.9 and Stubbs, 281 F.3d at 118
n.5). Although the District Court did conduct a colloquy
with him at that time, we view it as inadequate under our
precedent. While the Court did seek to ascertain the basis
for Peppers' dissatisfaction with counsel -- his reasons --
it did not satisfactorily address the heart of the Faretta
inquiry.

As stated above, the second, and, in this case, core
responsibility that the court bears is to inquire as
thoroughly as needed to satisfy itself that the defendant
understands "the nature of the charges, the range of
possible punishment, potential defenses, technical
problems that the defendant may encounter, and any other
facts important to a general understanding of the risks
involved." Charles, 72 F.3d at 404. The Court never sought
to determine whether Peppers understood the risks-- the
structural limitations or perils of representing himself --
but focused instead on the ways that Peppers could be
accommodated by counsel's representation:

> Mr. Peppers, you have some very, very serious
> charges against you in this matter. You have had no
> experience in doing this before. Conspiracy is a
> complicated matter. So is the killing of an individual in
> the course of a drug transaction.
>
> You also have a lot of witnesses that the government
> needs to obtain on your behalf. He is out there able to
> do that. You are confined. You will have every
> opportunity to convey your wishes to Mr. Welch, to
> present questions to him to present to the jury.

. . .

Well, this case is scheduled for the 20th. There are two weeks in between. I am directing Mr. Welch to sit down with you and go over the strategy that he intends. You can certainly supply him with the questions that you want him to address to your witnesses.

You will have the opportunity while you are sitting there at trial to present -- you will have a pad and paper. You can pass over to him questions. Of course,

it is up to him to decide whether or not the question is relevant and whether or not it would be objected to.

Although the Court characterized this exchange as "advis[ing] Defendant of the dangers of proceeding pro se," it did not apprise him of the full range of risks and structural limitations that would be attendant upon Peppers should he proceed pro se; nor does it even attempt to ascertain the extent of Peppers' understanding. The responsibility of determining whether a waiver is knowing and voluntary can be fulfilled only through adequate inquiry and thorough explanation by the District Court. Absent a proper inquiry, the District Court had no basis upon which to deny -- or to grant -- Peppers' request for self-representation. McMahon v. Fulcomer, 821 F.2d 934, 946 (3d Cir. 1987).

The Court's conclusion to deny Peppers' motion to proceed pro se was based largely on its determination that, taking into consideration the fact that Peppers was charged with serious offenses and incarcerated, he "is unable to contact or interview witnesses and prepare a case. Furthermore, Defendant has no legal training or expertise, and to allow Defendant to represent himself is equivalent to allowing him to stand trial with no representation at all." The Court's concern over Peppers' skill and legal competency misses the mark. Federal courts have stated repeatedly that a court must not evaluate whether the defendant is competent to represent himself as part of its determination of whether he is knowingly asserting the right to self-representation:

"The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will . . . . We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on voir dire. For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself."

Faretta, 422 U.S. at 835-36. See also Lopez v. Thompson, 202 F.3d 1110, 1119 (9th Cir. 2000) ("In assessing waiver

of counsel, the trial judge is required to focus on the defendant's understanding of the importance of counsel, not the defendant's understanding of the substantive law or the procedural details."); United States v. McKinley, 58 F.3d 1475,1481 (10th Cir. 1995) (listing cases finding error when a court denies self-representation based on its evaluation of a defendant's skills or preparation).

We have had occasion several times to describe the elements of what a court should or should not do in questioning a defendant when a request to proceed pro se is made.14 It presents a challenge for a judge, and it seems that invariably such a request comes at a time when it diverts from trial preparation. Just as there is no talismanic formula for a defendant's expression of desire in this regard, there is no talismanic formula for the court's inquiry. We have not hesitated to require that the defendant be informed of all risks and consequences associated with his decision for self-representation.

> To ensure that an accused is aware of the pitfalls possible in self-representation, "the district court should advise him in unequivocal terms both of the technical problems he may encounter in acting as his own attorney and of the risks he takes if his defense efforts are unsuccessful." See United States v. Welty, 674 F.2d 185, 188 (3d Cir. 1982). As a matter of constitutional law, we have imposed a clear and unambiguous obligation upon a trial judge who is faced with an accused who states merely that he is aware of his right to counsel but wishes to waive that right . . . . At a minimum, "to be valid [a defendant's] waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." 674 F.2d at 188-189 (quoting Von Moltke v.

---

14. To recite only a few examples, we set forth the elements of an appropriate colloquy in Welty, 674 F.2d at 188-89; Charles, 72 F.3d at 406-09; Buhl, 233 F.3d at 798-800; Stubbs, 281 F.3d at 117-19.

> Gillies, 332 U.S. 708, 724 (1948) (plurality opinion) (reversing denial of habeas petition because standard, pre-printed waiver of counsel form insufficient to satisfy Sixth Amendment)). We have held that an accused's protection under the Sixth Amendment Right to Counsel is not satisfied when a trial judge has failed

to conduct "a penetrating and comprehensive examination" of the accused's waiver attempt which ensures that the accused is knowledgeable about his decision, even when the colloquy skips just one of the above factors. See Welty, 674 F.2d at 189 (no waiver where court merely informed defendant that self-representation is "inadvisable") (quoting Von Moltke, 332 U.S. at 724 (plurality opinion)); see also United States v. Moskovits, 86 F.3d 1303, 1308 (3d Cir. 1996) (no waiver notwithstanding trial judge's detailed colloquy with defendant because judge failed to state that he was authorized to impose greater sentence than that imposed in defendant's first trial).

Henderson v. Frank, 155 F.3d 159, 166-67 (3d Cir. 1998) (granting a writ of habeas corpus where a petitioner had signed a "generic waiver form" and a petition to proceed pro se, but the trial court had not conducted a detailed colloquy). Nevertheless, we think that the following questions (derived in large part from Federal Judicial Center, Benchbook for U.S. District Court Judges S 1.02 (4th ed. 2000)) would prove a useful framework for the court to assure itself that a defendant's decision to proceed pro se is knowing and voluntary.

1. Have you ever studied law?*

2. Have you ever represented yourself in a criminal action?

3. Do you understand that you are charged with these crimes: [state the crimes with which the defendant is charged]?

4. Do you understand that the U.S. Sentencing Commission has issued sentencing guidelines that will be used in determining your sentence if you are found guilty?

5. Do you understand that if you are found guilty of the crime charged in Count 1, the Court must impose an

assessment of $___, and could sentence you to as many as ___ years in prison and fine you as much as $ ___? [Ask defendant this question for each count of the indictment or information.]

6. Do you understand that if you are found guilty of more than one of these crimes, this Court can order that the sentences be served consecutively, that is, one after another?

7. Do you understand that if you represent yourself, you are on your own? I cannot tell you -- or even advise you -- as to how you should try your case.

7a. Do you know what defenses there might be to the offenses with which you are charged? Do you understand

that an attorney may be aware of ways of defending against these charges that may not occur to you since you are not a lawyer? Do you understand that I cannot give you any advice about these matters?

8. Are you familiar with the Federal Rules of Evidence?*

8a. Do you understand that the Federal Rules of Evidence govern what evidence may or may not be introduced at trial and that, in representing yourself, you must abide by those rules?

9. Are you familiar with the Federal Rules of Criminal Procedure?*

9a. Do you understand that these rules govern the way a criminal action is tried in federal court? Do you understand that you must follow these rules?

10. Do you understand that you must proceed by calling witnesses and asking them questions, and that, except when and if you yourself testify, you will not be permitted to tell the jury matters that you wish them to consider as evidence?

10a. Do you understand that it may be much easier for an attorney to contact potential witnesses, gather evidence, and question witnesses than it may be for you?

11. I must advise you that in my opinion a trained lawyer would defend you far better than you could defend

24

yourself. I think it unwise of you to try to represent yourself. You are not familiar with the law. You are not familiar with court procedure. You are not familiar with the rules of evidence. I strongly urge you not to try to represent yourself.

12. Now, in light of the penalties that you might suffer if you are found guilty, and in light of all of the difficulties of representing yourself, do you still desire to represent yourself and to give up your right to be represented by a lawyer?

13. Are you making this decision freely, and does it reflect your personal desire?

14. Do you have any questions, or do you want me to clarify or explain further anything that we have discussed here?

If the answers to the foregoing questions satisfy the court that the defendant knowingly and voluntarily desires to proceed pro se, the court would then state the necessary conclusions, such as:

I find that the defendant has knowingly and voluntarily

waived the right to counsel. I will therefore permit the defendant to represent himself (or herself).

> \* As is evident from the follow-up questions, the purpose of inquiring as to the defendant's knowledge is only to ascertain the extent to which the defendant understands the procedure that is to be followed during the course of the trial, not to assess his legal knowledge or training to determine his ability to represent himself well.

Of course, if, during the course of inquiry, it appears that the defendant needs further explanation, or it is evident that the defendant does not comprehend what the court is saying or asking, the court will need to probe further.15

Here, the Court did not make a proper inquiry. Because error in assessing whether a defendant may represent

---

15. No issue as to whether appointment of standby counsel would be appropriate or advisable is before us.

25

himself is structural, it can never be harmless. E.g., Stubbs, 281 F.3d at 121 (citing McKaskle v. Wiggins, 465 U.S. at 177). Accordingly, we must remand this case to the District Court for a new trial.

C. Did the District Court Correctly Exclude Drake's Dying Declaration?16

1. Standard of Review

To the extent that our review of the District Court's determination implicates its interpretation of the Federal Rules of Evidence, our review is plenary, but where the District Court's ruling was "based on a permissible interpretation of a rule," we review only for an abuse of discretion. United States v. Console, 13 F.3d 641, 656 (3d Cir. 1993).

2. Discussion

Peppers asks us to determine that the District Court erred in refusing to admit the statements made by Jorge Drake after he was shot, purportedly identifying the actual shooter to various persons. Although multiple statements were made, only the one made to Officer Rivera as Peppers was being prepared for transport to Hershey Medical Center, when he responded to the officer's question as to who shot him with "Jun," may arguably be characterized as a dying declaration, and we will confine ourselves to discussing that statement.

A dying declaration is admissible as an exception to hearsay if the declarant makes the statement while "conscious of impending death and under the belief that

there is no chance of recovery." Webb v. Lane , 922 F.2d
390, 395 (7th Cir. 1991). A court may infer knowledge of
the seriousness of a declarant's condition from the"nature
and extent of the wounds inflicted." Id. (quoting Mattox v.
United States, 156 U.S. 237, 251 (1895)). Accord,

_____

16. Since we have ordered a new trial, we need not rely on this issue as
a grounds for reversal. However, we address it here in recognition that
the issue could recur when the case is retried. We confine our discussion
to the record in the first trial, realizing that a different situation may be
presented during the subsequent proceedings.

26

Commonwealth v. Cooley, 348 A.2d 103, 108 n.8 (Pa. 1975)
(listing cases and types of wounds supporting an inference
that the declarant sensed death was imminent).

In the District Court's ruling on the admissibility of the
evidence, it said, "At the hearing, Defendant was unable to
produce any evidence or testimony regarding the victim's
physical or mental state at the time these statements were
made." During the hearing on the government's motion in
limine, the Court had stated that it "needed some testimony
regarding the mental status of the soon to be deceased at
the time that he allegedly gave the statement to Officer
Rivera." Counsel explained that he had tried to contact the
physician who treated Drake in the emergency room, but
that physician had left the hospital's employ, and he had
been unable to locate him. Counsel did stipulate that the
facts as to Drake's physical condition were as they had
appeared in the report of the officer who interviewed Drake,
namely that at the time of the interview, Drake was heavily
sedated, his speech was slurred, and he had a bullet lodged
in his head.17 The District Court granted the government's
motion in limine to exclude the statements.

Obviously, since the declarant had died, we -- and the
District Court -- have no way of ascertaining precisely what
Drake knew or what his state of mind was at the time.
Even evidence regarding one statement made to  him might
not be conclusive, since we could not be sure whether other
statements were made, how the information was conveyed
to him, and how he received and responded to it.
Accordingly, it is clearly not only permissible, but indeed
necessary, consistent with our caselaw, that the trial judge
draw and rely on inferences from the facts of record,
including the type of wounds inflicted and the nature of the
declarant's injuries. See Webb, 922 F.2d at 395.

_____

17. These facts are taken from the government's brief on the motion in
limine, derived from Officer Rivera's report and stipulated to by Peppers'
counsel at the hearing on the motion in limine. Officer Rivera's report
also states that Drake was paralyzed on the left side of his body. Peppers
does not dispute the contents of the report. Peppers has moved to
include the report, but given the lack of argument as to its contents,
especially in light of the fact that it was not technically part of the record

at trial, we do not need to include it in the record on appeal.

27

Here, the only information we have as to what medical personnel may have communicated about Drake's condition immediately following the shooting was provided not to Drake himself, but to Officer Rivera. The officer was informed by an emergency physician that Drake had"a good chance for recovery," but there is no evidence in the record as to statements made to Drake, or his own beliefs or information about his condition. The District Court refused to admit the declaration about "Jun," expressing concern that it had not been provided with sufficient information as to Drake's perceptions of his condition at the time he made his statements. This rationale leaves us uncertain as to the District Court's understanding of its task. On the one hand, the District Court may have felt that it was the defendant's burden to provide direct proof, and that it was not enough for it to rely on inferences drawn from the record, including Drake's condition and the types of wounds inflicted. On the other hand, the District Court might have inferred from the information conveyed to Officer Rivera that Drake would have been told that he was not in danger of death, so something more was needed to convince the Court that the circumstances of Drake's injury and condition made the exception applicable. See , e.g., David v. Pueblo Supermarket of St. Thomas, 740 F.2d 230, 235 (3d Cir. 1984) (noting that the burden of establishing an exception to hearsay -- there, an excited utterance -- lies on the movant of the evidence). The District Court erred if the first explanation -- namely that a court must be provided with direct proof -- was at the heart of its ruling. If the second rationale -- that the inferences to be drawn from the proof were inadequate to tip the scales in favor of admissibility -- motivated the Court, there would be no abuse of discretion. Ordinarily, we would remand to the District Court for clarification. See, e.g., United States v. Sriyuth, 98 F.3d 739, 744 n.8 (3d Cir. 1996) (noting that where a District Court has not adequately set forth its basis for determining the admissibility of evidence (there under Rule 403), we may remand to the district court for clarification or even for a new trial). But here, as noted above, the issue may be raised anew at retrial, and on remand the Court should revisit this ruling if the Court misapprehended the evidence it should consider or the Defendant's burden.

28

IV. Conclusion

For the reasons stated above, we will VACATE the Judgment and Commitment Order and REMAND for a new trial.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit