**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-3395
_____

UNITED STATES OF AMERICA

v.

DARIUS CARTER,

Appellant

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-19-cr-00078-001)
Chief District Judge: Hon. Juan R. Sánchez
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
January 16, 2024
_____

Before: SHWARTZ, MATEY, and PHIPPS, Circuit Judges.

(Filed: January 18, 2024)
_____

OPINION[*]
_____

SHWARTZ, Circuit Judge.

---

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

Darius Carter was convicted of two counts of Hobbs Act robbery in violation of 18 U.S.C. § 1951(a).  Carter appeals, arguing that the District Court erred in (1) denying his motion to suppress evidence; (2) denying his request for new counsel or self-representation; and (3) admitting evidence under Federal Rule of Evidence 404(b).  Because the motion to suppress and request for new counsel or self-representation were properly denied, and the evidence was properly admitted, we will affirm.

I

A[1]

During a span of less than one week, two cellphone stores on the same block in Philadelphia, Pennsylvania were robbed at gunpoint.  Boost Mobile was robbed on October 18, 2018, and MetroPCS was robbed on October 23, 2018

A Boost Mobile employee described one of the two Boost Mobile robbers as a Black male, five feet nine inches tall, in his twenties, wearing "black pants with stripes on the side, [a] dark navy blue hood[ie], black sneakers, gloves, [a] mask, [and a] blue school book bag," and holding a black "semi-automatic handgun."  SA 202.  This description aligned with a screenshot of the robbers taken from Boost Mobile surveillance footage.[2]

---

[1] The facts in Section A are drawn from the evidence presented at the suppression hearing.  Many of these facts were also presented at trial.

[2] This screenshot was included in a police bulletin, together with a description of the crime, perpetrators, and the direction that they fled (northwest).

The MetroPCS robbery was not caught on camera but was witnessed by the store's manager, N.K. N.K. told Officer Thomas Bellon that (1) he and the robber stood face-to-face as N.K. helped another employee open the register for the robber; (2) the robber was a Black man weighing approximately 150 pounds, wearing "[a] blue Adidas jacket, blue pants, [and a] dark bandana on [his] face," SA 20-21, and holding a gun; and (3) the robber took off his mask, allowing N.K. to see his profile, before he fled northwest. Surveillance footage from three nearby buildings—all northwest of the store—show the robber walking toward MetroPCS and then running away from it around the time of the robbery.

Three days after the MetroPCS robbery, Bellon observed Carter in a high-crime area less than one mile northwest of the stores wearing a navy Adidas track jacket, black Adidas pants, black sneakers with white soles, and glasses. Bellon suspected that Carter might be the individual who robbed the cell phone stores based on Carter's location (nearby and northwest of the stores), gait, clothing, and physical appearance, which aligned with (1) the description received from N.K., (2) the surveillance footage from the MetroPCS robbery, and (3) the police bulletin's description of the Boost Mobile robber.

Bellon and his partner, Officer Elias Rosa, followed Carter into a small convenience store. As they approached, Carter took his hand from the counter and put it in his pocket and attempted to turn away from the Rosa. Carter was handcuffed and patted down and he asked whether he "match[ed] a description or something." SA 110.

3

The officers then asked Carter his name, to which he responded, "Jimmy Smith" then "James." SA 70. When asked for identification, he said he left it at home. The officers called for a police car with a Mobile Data Terminal ("MDT") to verify Carter's identity.[3] Six minutes later the MTD unit arrived, Carter was placed in the back seat of the car, and it was determined that no records matched the name and birthdate Carter provided.

The Officers then drove Carter the five minutes to the police station to confirm his identity. During the ride, Carter told the police that he lied about his name and that he had an outstanding arrest warrant. At the station, the police (1) verified Carter's real name; (2) confirmed the existence of a state parole warrant, (3) arrested him on the warrant; and (4) transferred him to a detention facility.

Police thereafter obtained a search warrant for Carter's room at the detention facility and recovered the clothing he wore when arrested. Police then searched the home of Carter's former girlfriend, B.W., which yielded no evidence. B.W. thereafter came to the police station with Carter's belongings, including a box for a BB gun[4] addressed to Carter at B.W.'s residence, which bore a postmark from about one month before the robberies.

Carter was subsequently charged with Hobbs Act robbery, and he moved to

---

[3] Police can use the MDT to search for arrest records and state-issued forms of identification.

[4] The box reads "GLOCK 19" in large letters and has an image resembling a real Glock 19 firearm.

suppress the evidence against him. The Court denied the motion, holding that Carter's seizure did not violate the Fourth Amendment because it (1) did not amount to a de facto arrest, and (2) was supported by reasonable suspicion. United States v. Carter, No. 19-cr-78, 2019 WL 6455212, at *4-8, 10 (E.D. Pa. Nov. 29, 2019).

B

Seven days before trial, the District Court held a pretrial conference at which Carter expressed dissatisfaction with his counsel, stating that she (1) lied to him about plea discussions with the Government, (2) failed to discuss trial strategies with him, and (3) was not prepared for trial. After questioning Carter and his counsel, the Court found that (1) counsel did not lie to Carter; (2) Carter misinterpreted counsel's invitation to negotiate with the Government as a formal plea offer from the Government; (3) counsel (a) had "zealously" and "vigorously" litigated his motion to suppress, SA 207, SA 220, (b) discussed trial strategies with Carter and (c) was prepared to proceed to trial; and (4) his request was a delay tactic.

As a result, the Court did not find good cause to remove counsel and informed Carter that he could proceed to trial with counsel or represent himself. Carter initially responded, "I pick to go by myself." SA 216. The Court then conducted the required colloquy, during which Carter repeatedly denied wanting to represent himself, continued to ask for new counsel and stated, "I've never wanted to represent myself." SA 240. Carter proceeded to trial with his counsel.

C

At trial, the Government introduced, among other things, the evidence described in Section A, victim testimony that identified Carter as the robber, and several text messages Carter sent to B.W. after she provided the police his belongings. In the messages, admitted under Rule 404(b), Carter: (1) asked B.W., "[]why would you want to betray me in such a manner[,] why would you tell [] on me?" SA 923, and continued, "your betrayal is wors[e] th[a]n death[,]" SA 923; and (2) warned, "[y]ou think you[']r[e] winnin[g] now, but not for long if you knew what I know you would laugh less and cry more!" SA 925. B.W. testified that these messages made her "uncomfortable" and "fearful." SA 708. The Court told the jury that (1) it could consider this evidence "only for the purpose of demonstrating [Carter's] consciousness of guilt and the effect of [Carter's] communications [on] the state of mind of the witness, [B.W.]," and not "for any other purpose," SA 889, and (2) it should "not consider this act as a substitute for proof that [Carter] committed the crimes charged," SA 889.

The jury found Carter guilty, and the Court sentenced him to 134 months' imprisonment. Carter appeals.

II[5]

---

[5] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

A[6]

Carter argues that the District Court erred in denying his motion to suppress because he was seized without reasonable suspicion or probable cause in violation of the Fourth Amendment. We disagree and conclude that, under these circumstances, handcuffing Carter and transporting him to the police station for identification constituted an investigative stop supported by reasonable suspicion and was not a de facto arrest.

In "distinguishing an investigative stop from a de facto arrest," the touchstone is whether the defendant was detained longer than necessary for the police to conduct their investigation. United States v. Sharpe, 470 U.S. 675, 685, 687 (1985). The duration and nature of the stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 20 (1968). Police may briefly stop a suspect when the officer has "reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony." United States v. Hensley, 469 U.S. 221, 229 (1985).

Here, the officers' actions—handcuffing Carter, placing him in a police car, and transporting him to the police station for identification—did not transform the Terry stop

---

[6] We "review[] the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercise[] plenary review of the District Court's application of the law to those facts." United States v. Perez, 280 F.3d 318, 336 (3d Cir. 2002) (citation omitted).

into a de facto arrest. It was reasonable to handcuff Carter during the <u>Terry</u> stop out of concern for the safety of themselves and others based on (1) the officers' suspicion that Carter had recently committed two armed robberies, and (2) Carter's behavior as the officers approached him in the store (taking his hand from the store counter and putting it into his pocket, while attempting to turn away from Officer Rosa). Indeed, handcuffing Carter "while . . . conducting an investigation [did not] automatically transform [this] otherwise-valid <u>Terry</u> stop into a full-blown arrest." <u>United States v. Johnson</u>, 592 F.3d 442, 448 (3d Cir. 2010).

Placing Carter in the police car and transporting him to the police station to confirm his identity also did not result in a de facto arrest. It was reasonable for the officers to place Carter in the car while running the MDT search in a high-crime area, given their experience that bystanders there may disrupt their investigative activity. When the MDT search came back with no results, it was reasonable to suspect that Carter provided a fake name, and to transport him to the police station to confirm his identity. <u>See</u> <u>United States v. Foster</u>, 891 F.3d 93, 106-07 (3d Cir. 2018) (holding that it was not unreasonable to transport defendant a short distance so that he could be identified); <u>see also</u> <u>Hensley</u>, 469 U.S. at 229 ("[W]here police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice.").

8

Finally, the duration of Carter's detention did not convert the stop into an arrest. Carter was detained for less than twenty minutes before he told the police that he was lying about his name and that he had an outstanding warrant. Six of those minutes were spent waiting for the police car to arrive to verify Carter's identity using the MDT. It was only after the MDT failed to identify Carter that the officers decided to transport Carter to the station, a five-minute drive away, to verify his identity. Thus, the police acted diligently in attempting to identify Carter and any delays caused by Carter providing false information did not make the stop unreasonable. See Sharpe, 470 U.S. at 688 (twenty-minute stop not "unreasonable when the police have acted diligently, and a suspect's actions contribute[d] to the added delay").

Because Carter's detention amounts to a Terry stop, not a de facto arrest, we next consider whether the officers had reasonable suspicion to make the stop. A reasonable suspicion must be grounded in "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." Johnson v. Campbell, 332 F.3d 199, 205 (3d Cir. 2003) (internal quotation marks and citations omitted).

Articulable facts justified the seizure. Bellon observed Carter less than one mile northwest of the cell phone stores, which was the direction that the robber came from and fled to. See United States v. Goodrich, 450 F.3d 552, 561 (3d Cir. 2006) (considering "the geographical and temporal proximity of the stop to" the crime scene in determining

9

whether reasonable suspicion exists).  In addition, Carter's build, height, gait, and clothing aligned with (1) the description that N.K. provided to the police who responded to the scene within minutes of the robbery,[7] (2) the Boost Mobile crime bulletin,[8] and (3) Bellon's observation that Carter matched surveillance videos from the area near MetroPCS.  Because there was reasonable suspicion to stop Carter, the motion to suppress the evidence seized thereafter was properly denied.

B[9]

We next address whether the District Court erred in denying Carter's request under the Sixth Amendment for new counsel or to proceed pro se.  United States v. Stubbs, 281 F.3d 109, 116-17 (3d Cir. 2002).  We "undertake a two-prong inquiry when a defendant expresses a desire to either substitute counsel or proceed pro se on the eve of trial."  Id. at 117 (citing United States v. Welty, 674 F.2d 185 (3d Cir. 1982)).  We

---

[7] See United States v. Brown, 448 F.3d 239, 249 (3d Cir. 2006) (holding that information from a witness who recently observed the alleged criminal activity is generally viewed as reliable); United States v. Valentine, 232 F.3d 350, 354 (3d Cir. 2000) (information received "face to face is more reliable" than that given anonymously).

[8] See Hensley, 469 U.S. at 232 ("[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification." (citations omitted)).

[9] We review a district court's determination of whether good cause exists to replace court-appointed counsel for abuse of discretion.  United States v. Senke, 986 F.3d 300, 309 (3d Cir. 2021).  We exercise plenary review of a district court's determination of whether a defendant should be permitted to exercise his Sixth Amendment right to self-representation and review facts it found for clear error.  United States v. Peppers, 302 F.3d 120, 127 (3d Cir. 2002).

determine first if the accused can "show good cause for dismissing counsel, such as a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict with his attorney." Id. (quoting Welty, 674 F.2d at 188). If good cause exists, "counsel should be dismissed, even though it may necessitate continuing the trial." Id. (internal quotation marks and citation omitted). If the defendant does not establish good cause, then the defendant must choose between proceeding pro se or accepting counsel's representation. Id.

Carter has not shown clear error in any of the District Court's findings and the Court acted well within its discretion in concluding that there was no good cause to replace counsel. The Court had a basis to conclude that Carter's request was a delay tactic given that each complaint about counsel was meritless. Based on the record, the Court found that: (1) Carter misunderstood his counsel's invitation to negotiate with the Government to be a formal offer (which he nonetheless elected not to pursue), and (2) Carter's counsel (a) "zealously" and "vigorously" litigated the motion to suppress, SA 207, 220; (b) discussed trial strategy and defenses with him; and (c) was prepared for trial.

The District Court also informed Carter of his right to proceed with his current counsel or represent himself and conducted the required colloquy. See United States v. Peppers, 302 F.3d 120, 133 (3d Cir. 2002). Carter repeatedly interrupted the colloquy with requests for new counsel and assertions that he did not want to represent himself.

11

Because Carter did not clearly and unequivocally waive his right to counsel, Peppers, 302 F.3d at 132, the Court did not err in having Carter's counsel continue representing him.

C[10]

The District Court also did not abuse its discretion by admitting the text messages to B.W. under Rule 404(b). Rule 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). "Other act" evidence, however, is admissible when offered for a proper purpose "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). If the "other act" evidence: (1) is "proffered for a non-propensity purpose"; (2) is "relevant to the identified non-propensity purpose"; (3) has probative value that is not "substantially outweighed by its potential for causing unfair prejudice to the defendant"; and (4) is "accompanied by a limiting instruction," then it is admissible. United States v. Foster, 891 F.3d 93, 107 (3d Cir. 2018) (quoting United States v. Repak, 852 F.3d 230, 241 (3d Cir. 2017)). The objected-to text messages satisfy these four elements.

As to the first and second factors, Carter's text messages were proffered for, and relevant to, a non-propensity purpose because they showed consciousness of guilt and the

---

[10] "We review a district court's evidentiary rulings for an abuse of discretion." United States v. Caldwell, 760 F.3d 267, 274 (3d Cir. 2014) (citation omitted).

12

effect on B.W. See United States v. Gatto, 995 F.2d 449, 454 (3d Cir. 1993) ("Evidence of threats or intimidation is admissible under Rule 404(b) to show a defendant's consciousness of guilt[.]").  In the messages, Carter berated B.W. for giving the police his belongings and asked why she would "tell on[ him]" and "betray [him]"—a betrayal Carter characterized as "wors[e] th[a]n death[.]"  SA 923.  The messages also warned B.W. that "if [she] knew what [he] know[s] [she] would laugh less and cry more[.]" SA 926.  The jury could reasonably conclude from these messages that Carter was implicitly threatening B.W. for providing evidence of his guilt and attempting to discourage her from cooperating further.  Indeed, B.W. testified that receiving these messages made her "fearful." SA 708.

As to the third factor, the probative value of the text message is not substantially outweighed by the risk of unfair prejudice, and thus met Rule 403's balancing test. Under Rule 403, evidence can be kept out only if its unfairly prejudicial effect substantially outweighs its probative value.  United States v. Cross, 308 F.3d 308, 323 (3d Cir. 2002) (citing Fed. R. Evid. 403).  Here, the text messages provided a basis for the jury to infer Carter's subjective feelings about his conduct and, given the other evidence against him, any potential prejudice does not substantially outweigh its probative value.[11]

_____

[11] Carter argues that some of the messages refer to Muslim religious texts and they invited anti-Muslim bias, but the Court (1) asked prospective jurors during voir dire whether the defendant's race, religion, background, or appearance would make it difficult

13

Finally, the Court provided the jury with limiting instructions that mitigated the danger of unfair prejudice. The Court told the jury that it could consider the text messages "only for the purpose of demonstrating the defendant's consciousness of guilt and the effect of the defendant's communications [on] the state of mind of the witness, [B.W.]," and "not [to] consider [it] for any other purpose." SA 889. The Court further admonished the jury that it should not (1) "consider this act as a substitute for proof that [Carter] committed the crimes charged," or that Carter "has a bad character or a propensity to commit crimes," or (2) "conclude that because [Carter] may have committed this act, he must also have committed the acts charged in the indictment," SA 889. By limiting the purpose for which the jury could consider the evidence, and because we presume jurors follow the Court's instructions, Richardson v. Marsh, 481 U.S. 200, 211 (1987), the clear and specific limiting instruction minimized any unfair prejudice from the recording. Thus, the Rule 404(b) evidence was properly admitted.

III

For the foregoing reasons, we will affirm.

---

for them to be fair or impartial; and (2) instructed (a) the Government to avoid mentioning Carter's Muslim faith or the Quran; and (b) the jury twice that it should not be influenced by any person's race, color, or religion.