**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 19-3812 & 20-2235
_____

UNITED STATES OF AMERICA

v.

FREDERICK H. BANKS,
                              Appellant

_____

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Criminal Action No. 2-15-cr-00168-001)
District Judge: Honorable Mark R. Hornak


_____

Argued on March 29, 2022

Before: RESTREPO, ROTH, and FUENTES, <u>Circuit Judges</u>

(Opinion filed: November 30, 2022)

Abigail E. Horn          **(ARGUED)**
Federal Community Defender Office for
The Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center
Suite 540 West
Philadelphia, PA 19106

Counsel for Appellant


Laura S. Irwin          **(ARGUED)**
Office of the United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

Counsel for Appellee

OPINION OF THE COURT

**ROTH**, Circuit Judge:

A jury convicted Frederick Banks of wire fraud, and the District Court sentenced him to 104 months' imprisonment and three years' supervised release. On appeal, Banks argues that the District Court erred in three ways, by (1) denying his constitutionally protected right to self-representation, (2) applying the loss enhancement to the fraud guideline in the

United States Sentencing Guidelines because there was no "actual loss," and (3) imposing certain special conditions of supervised release.[1] We conclude that the loss enhancement in the Guideline's application notes impermissibly expands the word "loss" to include both intended loss and actual loss. Thus, the District Court erred when it applied the loss enhancement because Banks's crimes caused no actual loss. We will, therefore, affirm the judgment of the District Court except on the issue of loss enhancement; we will remand this case to the District Court for it to determine loss and to resentence Banks.

## I.

In January 2016, a federal grand jury indicted Frederick Banks for stalking, wire fraud, aggravated identity theft, and making false statements. The wire fraud charges "related to interlocking schemes . . . carried out by [Banks] to fraudulently gain the money and property of others in relation to the FOREX.COM international exchange system by submitting phony registration information for himself and then using those registrations to execute bogus trades that would drop money into bank accounts that he had set up."[2]

### A. The Scheme

Banks's scheme targeted Gain Capital Group, which did business as Forex.com. Gain Capital's clients opened accounts, deposited funds, and then used those funds to invest in the foreign currency exchange market. Banks's plot was to

---

[1] Appellant's Br. at 2-4.
[2] Appx. 875.

3

open Gain Capital accounts and make electronic deposits into those accounts, but his deposits were drawn on bank accounts with insufficient funds. He then tried to withdraw funds from these accounts, "with the goal being to complete the withdrawals/transfers before the lack of supporting funds could be detected." To support his scheme, Banks made fraudulent representations through text message, telephone conversations, and emails. He misrepresented his identity, his income, his occupation, his net worth, and the balances in his bank accounts.

Importantly, Gain Capital suffered no actual loss. Banks made fraudulent deposits of $324,000 and unsuccessfully executed 70 withdrawals/transfers totaling $264,000. Gain Capital, however, did not transfer a single dollar to Banks.

## B. Banks's Competence to Stand Trial and Competence to Represent Himself

Early in Banks's prosecution, his court-appointed lawyer suggested to the District Court that Banks was not competent to stand trial and to assist in his own defense. The District Court concurred, relating that Banks

> appeared to be materially detached from reality, wholly inappropriate in his conduct, communications and general affect, and consumed, for reasons which to this day remain inexplicable, with the notion that the then-pending (and subsequently superseded) federal criminal charges should all be dismissed because

4

in [Banks's] estimation, [a] former FBI Agent had set him up in an earlier federal prosecution which long ago became final.[3]

Banks was also "fixat[ed] with the same CIA-induced 'voice to skull' telepathic communication" he referred to in an "allegedly fraudulent habeas petition."[4] The District Court also noted that Banks had previously told this Court that he was not competent to stand trial or represent himself, even when he told the trial court in those proceedings that he was competent.

Accordingly, the District Court ordered an evaluation of Banks. Dr. Robert Wettstein evaluated Banks and concluded he "was psychotic and delusional, and was subject to various forms of delusional and psychotic episodes."[5] Dr. Wettstein believed, however, that Banks could understand the nature and consequences of the criminal charges against him and could assist his lawyer in his defense.

The District Court then concluded "a second professional opinion was necessary to protect both the rights of [Banks] and the integrity of the judicial process."[6] Dr. Heather Ross, a forensic psychologist, concluded Banks "was so continuously delusional that he was not competent to stand trial, nor to waive his right to counsel and represent himself."[7] After the statutory period of restorative treatment, yet another forensic psychologist, Dr. Allisa Marquez, concluded not only

---

[3] Appx. 876.
[4] Appx. 876.
[5] Appx. 876.
[6] Appx. 877.
[7] Appx. 877-78.

that Banks was restored to competency, but that he had never been incompetent (as defined in 18 U.S.C. § 4241) because he did not then suffer from, and had never suffered from, "any mental disease or defect but was instead afflicted with a chronic narcissistic and paranoid personality disorder, which would cause him to act out of a disproportionate sense of self grandeur but would not make him incompetent."[8]

After these evaluations, the District Court "repeatedly solicited the position of both the United States and [Banks's] appointed counsel as to the issue of competency. They . . . each uniformly and consistently expressed their observation that [Banks] [was] neither competent to stand trial, nor to waive counsel and represent himself at any such trial."[9] Combined with the District Court's own observations of Banks, the District Court accepted the conclusions of Drs. Wettstein and Ross that Banks suffered from "a mental disease or defect of psychosis and delusional paranoia," but the District Court also accepted the doctors' conclusions that Banks was "competent to be tried."[10]

Then the District Court considered Banks's "repeatedly asserted desire to waive representation by counsel and represent himself."[11] Although the District Court acknowledged that "ordinarily, if a defendant is competent to be tried, that means as a matter of course that such a defendant is competent to represent himself," it explained that trial court judges are in a "particularly apt position . . . to assess such

---

[8] Appx. 878.
[9] Appx. 878.
[10] Appx. 886.
[11] Appx. 887.

matters, and that there can be a narrow class of cases in which that parallel conclusion does not hold."[12]

The District Court concluded that the "content and volume" of Banks's filings demonstrated that he "is so detached from the reality as to what can and cannot be accomplished by legal processes that he has sought to assert in the context of a federal criminal trial that he has not knowingly and voluntarily waived his right to be represented by counsel in the defense of these serious criminal charges, and is not capable of doing so."[13] Although Banks "can understand the charges against him, and what can happen to him if he is convicted of them, and that he can assist his lawyer as that lawyer pulls the levers of justice on his behalf in the course of a criminal trial . . . he has no competence to make the decision to give up his right to be represented by a lawyer in that trial and related proceedings in any knowing way."[14]

At trial, the jury convicted Banks of four counts of wire fraud and one count of aggravated identity theft.[15]

## C. Sentencing

Banks's offense level computation under the United States Sentencing Guidelines included a special offense characteristic for the attempted loss Banks intended to inflict on Gain Capital. According to the presentence investigation

---

[12] Appx. 887.
[13] Appx. 887.
[14] Appx. 887.
[15] The government dismissed the stalking and false statements charges.

7

report:

> The attempted loss, based on [Banks's] fraudulent deposits, is $324,000. Therefore, the base offense level is increased by 12 because the attempted loss was greater than $250,000 but less than $550,000. USSG §2B1.1(b)(1)(G) (As a general rule, loss is the greater of actual loss or intended loss, pursuant to Application Note 3).[16]

The 12-point increase raised Banks's adjusted offense level from 7 to 19. During sentencing, the District Court explained that the Sentencing Guidelines define "loss to not only be actual loss, but to be intended loss. And the application notes indicate that the intended loss counts into the calculation of the loss amount, even if it's determined to be improbable or impossible of occurrence."[17] The District Court found that the loss amount exceeded $250,000, triggering the 12-point loss-amount enhancement. The District Court explained that Banks "intended to cause a loss in a pecuniary amount in excess of $250,000" and that Banks "by his conduct, intended to cause such a loss; and, therefore, it is appropriately added into the guidelines calculation under 2B1.1."[18]

The District Court sentenced Banks to 104 months' imprisonment and three years of supervised release.

---

[16] PSR ¶ 22.
[17] Appx. 1877.
[18] Appx. 1897.

## II.    [19]

Banks makes three arguments on appeal.  First, he contends that the District Court erred in denying his constitutionally protected right to self-representation.  Second, he asserts that the loss enhancement to the fraud guideline, found at U.S.S.G. § 2B1.1, should not apply because there was no actual loss.  Third, he argues that District Court erred in imposing certain special conditions of supervised release.  Because the term "loss" is unambiguous in the context of § 2B1.1 and because the loss-enhancement commentary improperly expands the Guideline, we will vacate Banks's judgment of sentence and remand this case to the District Court for resentencing.  We will affirm the District Court's orders denying Banks's request to represent himself and imposing the special conditions of supervised release.

### A. Banks's Right to Self-Representation[20]

---

[19] The District Court had subject-matter jurisdiction under 18 U.S.C. § 3231.  We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

[20] We exercise plenary review in evaluating the legal conclusion of whether Banks knowingly and voluntarily waived his right to counsel. *United States v. Peppers*, 302 F.3d 120, 127 (3d Cir. 2002) (citing *United States v. Stubbs*, 281 F.3d 109, 113 n.2 (3d Cir. 2002)).  We review for clear error the District Court's factual findings. *Id.* (citing *Government of Virgin Islands v. Charles*, 72 F.3d 401, 404 (3d Cir. 1995)).  "The right of a defendant to represent himself is structural; as such, 'its denial is not amenable to harmless error analysis.  The right is either respected or denied; its deprivation cannot

9

Generally, criminal defendants have a constitutional right to eschew a lawyer and go it alone.[21] That right, however, requires a district court to confirm the defendant knowingly and intentionally relinquishes the benefits of counsel.[22] Banks wished to exercise this right, but the District Court concluded that Banks was incapable of knowingly and voluntarily waiving his right to be represented by counsel. We agree and will affirm the District Court's order denying Banks's request to proceed without counsel.

Banks mainly contends the District Court applied the wrong test when it assessed whether his waiver of his right to counsel was knowing and voluntary. He suggests the District Court improperly conflated a knowing and voluntary waiver with a determination of Banks's competency for self-representation at trial. We disagree.

In our Circuit, a defendant may only waive his right to counsel if three requirements are met:

1. The defendant must assert his desire to proceed *pro se* clearly and unequivocally.
2. The court must inquire thoroughly to satisfy

---

be harmless.'" *Id.* (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984) (internal quotations omitted)).

[21] *See, e.g.*, *Faretta v. California*, 422 U.S. 806 (1975).

[22] *Faretta*, 422 U.S. at 835; *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938)); *see also McKaskle*, 465 U.S. at 173 (the Sixth Amendment grants a defendant the "right to conduct his own defense, provided only that he knowingly and intelligently forgoes his right to counsel and that he is able and willing to abide by rules of procedure and courtroom protocol.").

itself that the defendant understands "the nature of the charges, the range of possible punishments, potential defenses, technical problems that the defendant may encounter, and any other facts important to a general understanding of the risks involved."

3. The court must "assure itself" that the defendant is competent to stand trial.[23]

This appeal, and our analysis, focuses on the second requirement—whether the District Court properly concluded Banks did not knowingly and voluntarily waive his right to counsel. We begin with the District Court's analysis. The District Court found that

> the content and volume of [Banks's] filings demonstrate to this Court . . . that [Banks] is so detached from the reality as to what can and cannot be accomplished by legal processes that he has sought to assert in the context of a federal criminal trial that he has not knowingly and voluntarily waived his right to be represented by counsel in the defense of these serious criminal charges, and is not capable of doing so.[24]

The District Court added that although Banks understood the charges against him, and what could happen to him if convicted, "he has no competence to make the decision to give up his right to be represented by a lawyer in that trial and

---

[23] *Peppers,* 302 F.3d at 132 (internal citations omitted). We explained in *Peppers* that these three requirements are "[i]n skeletal form." *Id.*

[24] Appx. 887.

11

related proceedings in any knowing way."[25] Based on the District Court's colloquies with Banks, the District Court concluded that Banks's mental state, "is such that he not only cannot, but is not capable of, understanding what it means to give up his right to a lawyer and take on his own criminal defense representation."[26] At bottom, the District Court explained that Banks is incapable of "sufficiently separating fact from his own delusions so as to make a knowing decision to go it alone at trial."[27]

The District Court predicated its finding that Banks could not understand the risks of self-representation on Banks's voluminous filings and the court's own observations of Banks over several years. The court had noted Banks's "unrelenting focus" on his "perceived facts of the investigation of the prior criminal convictions on the federal criminal charges against him, which have long ago become final and conclusive," coupled with his "unrelenting and persistent focus on CIA-managed 'voice-to-skull' technology, a construct as to which he admits he has no factual basis to conclude was ever applied to him."[28]

Because the District Court properly concluded Banks could not knowingly and voluntarily waive his right to counsel, we will affirm the District Court's order denying Banks's request for a waiver of counsel.

---

[25] Appx. 887.

[26] Appx. 889.

[27] Appx. 890. The District Court pointed out that Banks's counsel shared this view. Appx. 890 n.14.

[28] Appx. 888.

12

### B. The Intended-Loss Enhancement in Guideline § 2B1.1[29]

Next, we turn to Banks's argument that the District Court erroneously applied the intended-loss enhancement to his sentence when the victim suffered $0 in actual losses. The application of the intended-loss enhancement hinges on the meaning of the term "loss" as used in Guideline § 2B1.1. Because the United States Sentencing Commission has interpreted "loss" in its commentary, the weight afforded to that commentary may affect the meaning of "loss."

Courts treat the Sentencing Guidelines as legislative rules, and the Sentencing Commission's comments interpreting its Guidelines as interpretative rules.[30] Historically, first, under *Bowles v. Seminole Rock & Sand Company*,[31] and, later, under *Auer v. Robbins*,[32] courts deferred to the Sentencing Commission's interpretation of its own regulations.[33] Application of *Auer* deference required courts to defer to the Sentencing Commission's commentary for a Guideline unless that interpretation was plainly erroneous or

---

[29] We review this legal issue de novo. *United States v. Nasir*, 17 F.4th 459, 468 (3d Cir. 2021) (en banc). We review the District Court's factual findings in support of the intended-loss enhancement for clear error. *United States v. Huynh*, 884 F.3d 160, 165 (3d Cir. 2018).

[30] *Stinson v. United States*, 508 U.S. 36, 44-45 (1993).

[31] 325 U.S. 410 (1945).

[32] 519 U.S. 452 (1997).

[33] *Stinson*, 508 U.S. at 45 (quoting *Seminole Rock*, 325 U.S. at 414).

inconsistent with the Guideline.[34]

Recently, however, the Supreme Court decided *Kisor v. Wilkie*, in which it made clear that, before according *Auer* deference, "a court must exhaust all the 'traditional tools' of construction,"[35] and determine that a regulation is "genuinely ambiguous."[36] Under *Kisor*, then, a court must consider the "text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on."[37]

What's more, a court must make an "independent inquiry" into the "character and context" of the reasonable interpretations of the regulation.[38] The Supreme Court identified three character-and-context circumstances under which an agency's otherwise reasonable interpretation should not receive controlling weight: (1) when an agency's interpretation is not its "'authoritative' or 'official position'"[39]; (2) when an agency's interpretation does not implicate its "substantive expertise" in some way;[40] and (3) when an agency's reading does not reflect its "fair and considered judgment" but rather is a "convenient litigating position," a

---

[34] *See Stinson*, 508 U.S. at 47; *see also* U.S.S.G. § 1B1.7, Commentary.

[35] 139 S. Ct. 2400, 2415 (2019) (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council Inc.*, 467 U.S. 837, 843 n.9 (1984)).

[36] *Id.* at 2414.

[37] *Id.* at 2415.

[38] *Id.* at 2416.

[39] *Id.* (quoting *United States v. Mead Corp.*, 553 U.S. 218, 257 (2001) (Scalia, J., dissenting)).

[40] *Id.* at 2417.

"*post hoc* rationalization"[41] or parroting of a federal statute.[42] Under *Kisor*, then, there must be both a genuine ambiguity in an agency's regulation and the character and context of an agency's interpretation must fall within the regulation's zone of ambiguity.[43]

Against this backdrop, this Court sat *en banc* and unanimously concluded that this reprised standard for *Auer* deference applied to the Sentencing Commission's interpretive commentary.[44] "If the Sentencing Commission's commentary sweeps more broadly than the plain language of the guideline it interprets, we must not reflexively defer. The judge's lodestar must remain the law's text, not what the [Sentencing] Commission says about that text."[45] That framework, then, applies to Banks's challenge to § 2B1.1's intended-loss enhancement.[46]

---

[41] *Id.* at 2417 (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (cleaned up)).

[42] *See id.* at 2417 n.5 (citing *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006))

[43] *Id.* at 2415-18.

[44] *See Nasir*, 17 F.4th at 470-71.

[45] *Id.* at 472 (Bibas, J., concurring).

[46] *Nasir* does not prevent courts from considering other forms of commentary – background commentary or commentary regarding departure from a Guideline – or other resources from the Sentencing Commission in imposing a sentence. *See Nasir*, 17 F.4th at 470-71; *see also* U.S.S.G. § 1B1.7 (describing three types of commentary to the Guidelines). *Nasir* applies the *Kisor* process only to a court's use of the Sentencing Commission's interpretive commentary as a tool to determine the *meaning* of a Guideline. *See Nasir*, 17 F.4th at 470-71; *see*

We begin with the plain text of § 2B1.1.[47] The Guideline is titled "Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States."[48] The Guideline then provides a graduated scale based on the monetary amount of loss. As the victim's monetary loss grows, so too does the enhancement to the defendant's offense level:

---

*also Stinson*, 508 U.S. at 45.

[47] Although we have suggested that "[b]y interpreting 'loss' to mean intended loss, it is possible that the commentary 'sweeps more broadly than the plain text of the Guideline,'" we have not resolved the issue. *See United States v. Kirschner*, 995 F.3d 327, 333 (3d Cir. 2021) (quoting *United States v. Nasir*, 982 F.3d 144, 177 (3d Cir. 2020) (en banc) (Bibas, J., concurring)).

[48] U.S.S.G. § 2B1.1.

| | Loss (apply the greatest) | Increase in Level |
|---|---|---|
| (A) | $6,500 or less | no increase |
| (B) | More than $6,500 | add 2 |
| (C) | More than $15,000 | add 4 |
| (D) | More than $40,000 | add 6 |
| (E) | More than $95,000 | add 8 |
| (F) | More than $150,000 | add 10 |
| (G) | More than $250,000 | add 12 |
| (H) | More than $550,000 | add 14 |
| (I) | More than $1,500,000 | add 16 |
| (J) | More than $3,500,000 | add 18 |
| (K) | More than $9,500,000 | add 20 |
| (L) | More than $25,000,000 | add 22 |
| (M) | More than $65,000,000 | add 24 |
| (N) | More than $150,000,000 | add 26 |
| (O) | More than $250,000,000 | add 28 |
| (P) | More than $550,000,000 | add 30. |

The Guideline does not mention "actual" versus "intended" loss; that distinction appears only in the commentary. That absence alone indicates that the Guideline does not include intended loss.[49]

The government concedes that "the presumption is that a word carries its ordinary meaning (and thus may resolve its ambiguity)."[50] We agree. The ordinary meaning of "loss" in the context of § 2B1.1 is "actual loss." This result is confirmed by dictionary definitions of "loss."[51] The 1993 edition of

---

[49] *See Nasir*, 17 F.4th at 471.
[50] Government's Br. at 38.
[51] *See, e.g.*, *Borden v. United States*, 141 S. Ct. 1817, 1830

*Webster's New International Dictionary* defines "loss" as:

> (a) the act or fact of losing;
> (b) a person or thing or an amount that is lost;
> (c) the act or fact of failing to gain, win, obtain, or utilize;
> (d) A decrease in amount, magnitude, or degree;
> (e) the state or fact of being destroyed or placed beyond recovery; and
> (f) the amount of an insured's financial detriment due to the occurrence of a stipulated contingent event.[52]

The 1988 edition of *Webster's Ninth New Collegiate Dictionary* defines "loss" as:

> 1a: the act of losing possession b: the harm or privation resulting from loss or separation c: an instance of losing
> 2: a person or thing or an amount that is lost . . .
> 3 a: failure to gain, win, obtain, or utilize b: an amount by which the cost of an article or service exceeds the selling price

---

(2021) (a "term's ordinary meaning informs [the court's] construction."); *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1750 (2020) ("[T]he law's ordinary meaning at the time of enactment usually governs."); *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363 (2019) (noting that dictionary definitions "shed light on the statute's ordinary meaning.").

[52] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1338 (1993).

4: decrease in amount, magnitude, or degree

5: destruction, ruin

6: the amount of an insured's financial detriment by death or damage that the insurer become liable for . . ..[53]

In collecting dictionary definitions of "loss," the United States Court of Appeals for the Sixth Circuit wrote that:

> One dictionary defines the word to mean, among other things, the "amount of something lost" or the "harm or suffering caused by losing or being lost." *American Heritage Dictionary of the English Language* 1063 (3d ed. 1992). Another says it can mean "the damage, trouble, disadvantage, [or] deprivation … caused by losing something" or "the person, thing, or amount lost." *Webster's New World College Dictionary* 799 (3d ed. 1996). A third defines it as "the being deprived of, or the failure to keep (a possession, appurtenance, right, quality, faculty, or the like)," the "[d]iminution of one's possessions or advantages," or the "detriment or disadvantage involved in being deprived of something[.]" 9 *Oxford English Dictionary* 37 (2d ed. 1989).[54]

Our review of common dictionary definitions of "loss" point to an ordinary meaning of "actual loss." None of these definitions suggest an ordinary understanding that "loss"

---

[53] WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 706 (1988).

[54] *United States v. Riccardi*, 989 F.3d 476, 486 (6th Cir. 2021).

means "intended loss." To be sure, in context, "loss" could mean pecuniary or non-pecuniary loss and could mean actual or intended loss.[55] We need not decide, however, whether one clear meaning of the word "loss" emerges broadly, covering every application of the word. Rather, we must decide whether, in the context of a sentence enhancement for basic economic offenses, the ordinary meaning of the word "loss" is the loss the victim actually suffered.[56] We conclude it is.

Because the commentary expands the definition of "loss" by explaining that generally "loss is the greater of actual loss or intended loss,"[57] we accord the commentary no weight. Banks is thus entitled to be resentenced without the 12-point intended-loss enhancement in § 2B1.1.[58]

## C. The Special Conditions of Supervised Release[59]

---

[55] *See id.* ("'loss' can mean different things in different contexts.").

[56] A plain and ordinary reading of § 2B1.1 confirms "loss" means "actual loss." It is only when we turn to the commentary that the ambiguity of "actual" or "intended" loss is injected.

[57] U.S.S.G. § 2B1.1 App. Note 3(A).

[58] Our holding should not be read as imposing any restriction on a district court's discretion to vary a sentence when appropriate.

[59] We review a district court's decision to impose special conditions of supervised release for abuse of discretion. *United States v. Icker*, 13 F.4th 321, 327 (3d Cir. 2021) (citing *United States v. Loy*, 237 F.3d 251, 256 (3d Cir. 2001)). When, however, a defendant fails to object to a special condition at sentencing, we review the imposition of special conditions for

Finally, Banks argues the District Court erred by imposing four special conditions of supervised release: (1) barring Banks from purchasing digital devices without approval; (2) barring Banks from conducting certain financial transactions without approval; (3) imposing costs and fees on Banks; and (4) requiring Banks to "cooperate in the collection of DNA as directed by the Probation Officer, pursuant to 28 C.F.R. § 28.12, the DNA Fingerprint Act of 2005, and"—as Banks underscores on appeal—"the Adam Walsh Child Protection and Safety Act of 2006."[60]

The government contends that Banks did not properly preserve his challenges to the special conditions because he did not object to any of them at sentencing. Banks concedes that his challenges to the device-purchase and financial-transactions conditions are unpreserved, so we will review those conditions for plain error. The parties dispute whether plain error or abuse of discretion guides our review of the costs

plain error. *Icker*, 13 F.4th at 327 (citing *United States v. Maurer*, 639 F.3d 72, 77 (3d Cir. 2011)). The Supreme Court described a four-part inquiry courts should follow when conducting plain-error review under Federal Rule of Criminal Procedure 52(b): "[t]here must (1) be an 'error' that (2) is 'plain' and (3) 'affects substantial rights'" of the defendant. *United States v. Williams*, 974 F.3d 320, 340 (3d Cir. 2020) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). "If these three conditions are satisfied, then it is within the sound discretion of the court of appeals to correct the forfeited error—but only if (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Williams*, 974 F.3d at 340 (quoting *Olano*, 507 U.S. at 732).
[60] Appx. 8.

and fees award and the DNA collection requirement under the Adam Walsh Act. It does not matter because under either standard we will affirm. We address each condition of supervised release in turn.

First, the District Court barred Banks from purchasing digital devices without approval.[61] Banks argues the condition is "contradictory, vague, and violates" 18 U.S.C. § 3583(d)(2).[62] We disagree. The District Court's condition is not contradictory because it merely forbids Banks from purchasing new digital devices, not from using digital devices he already owns. The District Court's condition is not vague because it gives Banks fair warning of his legal obligation.[63] A condition of supervised release "is void for vagueness if it 'either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'"[64] We are unpersuaded, however, by Banks's argument that "computers, cell phones, or electronic communication or data storage devices" is so vague Banks must guess at its meaning. Further,

---

[61] The special condition explained Banks shall not "purchase computers, cell phones, or electronic communication or data storage devices without the consent of the probation officer." Appx. 8.

[62] Appellant's Br. at 49. Banks contends that this condition contradicts with a later condition that states Banks "is permitted to possess and/or use a computer and is allowed to access the internet." Appx. 8.

[63] *See United States v. Maloney*, 513 F.3d 350, 357 (3d Cir. 2008).

[64] *Id.* (quoting *United States v. Lee*, 315 F.3d 206, 214 (3d Cir. 2003)).

Banks can either ask his probation officer for guidance or can bring an as-applied challenge should an issue arise.[65]

The device-purchase condition also does not violate 18 U.S.C. § 3583(d)(2)'s requirement that special conditions be narrowly tailored. Banks argues this restriction "may apply to benign devices such as fitness trackers and smart appliances" and that with respect to computers "any safety concerns are already addressed by other conditions—providing usernames and passwords, installing monitoring software, and conducting unannounced examinations."[66] However, we agree that the District Court properly limited Banks's access to digital devices based on "the mechanisms by which [he] engaged in [his] fraudulent conduct."[67] The District Court explained why it ordered these special conditions:

> Mr. Banks, I'm imposing those computer restrictions because that's the tools you use to trick other people, to try and take their money, to try and enrich yourself, to commit fraud. And I specifically find in the facts of your case that there's no basis for the Court to conclude that you're not unwilling to continue to do so. Those are the tools of the fraud that you committed in this case. Those are the tools of the crimes of conviction in this case.

---

[65] *See, e.g.*, *United States v. Comer*, 5 F.4th 535, 544 (4th Cir. 2021) (concluding the defendant "can always bring an as-applied challenge down the road if she believes her rights have been violated by a specific application of the condition.").

[66] Appellant's Br. at 52.

[67] Appx. 1972.

> When I couple that with your prior record of federal criminal convictions for fraud, the aggravated identity theft conviction in this case, your willingness to cause turmoil in the lives of other people by legal filings, by financial chicanery, I specifically find and conclude that it's necessary for you to comply with the law and to fulfill the purposes of supervised release that all of those conditions be in place in your case.[68]

The District Court's findings and reasoning support the device-purchase conditions and are narrowly tailored to Banks. We will affirm the device-purchase conditions.

Second, the District Court barred Banks from conducting certain financial transactions without approval. The District Court prohibited Banks from "engag[ing] in financial transactions in any single amount in excess of $500.00 (or cumulatively within any 7 day period in excess of $100[0].00) without approval of the probation office."[69] Banks argues this condition is vague and violates 18 U.S.C. § 3583(d)(2). For example, Banks suggests that it is unclear whether he is barred from using an ATM to deposit a paycheck or withdraw cash to pay his rent. Such a reading is not one that "men of common intelligence" would guess at or differ as to

---

[68] Appx. 1974-75.

[69] Appx. 9. The District Court inadvertently wrote $100.00 in its written special conditions, but during the oral sentencing the District Court explained the cumulative amount was $1,000.00. *See* Appx. 1973.

24

its application.[70] Indeed, conditions "may afford fair warning even if they are not precise to the point of pedantry," and "can be written—and must be read—in a commonsense way."[71] We disagree the financial-transactions condition is vague.

For the same reasons, we agree that the financial-transactions condition does not violate 18 U.S.C. § 3583(d)(2). Banks identifies myriad mundane transactions—paying rent, utility bills, and other expenses—that are barred by this condition and which must mean it is not narrowly tailored. To be sure, this condition could render modern life difficult, where much commerce is transacted using electronic devices.[72] That is true, though, of many conditions of probation. Banks himself concedes he can simply get approval from his probation officer to pay his bills online or to use an ATM to withdraw needed funds. For these reasons, we conclude the financial-transactions condition does not violate 18 U.S.C. § 3583(d)(2).

Third, the District Court imposed certain costs and fees on Banks.[73] Banks contends that the District Court gave no reason for these conditions, in violation of 18 U.S.C. § 3583(d)(1) and (2). Banks further asserts that he is indigent, lacks family support and housing, and cannot afford to pay a fine. The condition, however, is permissive, not mandatory.

---

[70] *Maloney*, 513 F.3d at 357 (quoting *Lee*, 315 F.3d at 214).

[71] *United States v. Gallo*, 20 F.3d 7, 12 (1st Cir. 1994).

[72] *See, e.g.*, *United States v. Albertson*, 645 F.3d 191, 199 (3d Cir. 2011).

[73] *See* Appx. 1970-73 (explaining several times that Banks "may be required to contribute to the cost of treatment services in an amount not exceeding the actual cost.").

Although the written special conditions say Banks "shall be required to contribute to the costs of services,"[74] the District Court's oral sentence states that Banks "may be required to contribute to the cost of treatment services[.]"[75] We "follow the 'firmly established and settled principle of federal criminal law that an orally pronounced sentence controls over a judgment and commitment order when the two conflict.'"[76] So, the District Court's oral pronouncement that Banks "may" have to contribute controls.

More importantly, Banks's challenge to this potential imposition of costs is unripe. Because the probation office indeed might not require Banks to contribute to these costs, his challenge "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."[77] If Banks wishes to conform the written special conditions to the District Court's oral pronouncement, he may move under Federal Rule of Criminal Procedure 36 to do so. But we may not review his unripe challenge to a potential special condition.

Finally, the District Court ordered that Banks "shall cooperate in the collection of DNA as directed by the Probation Officer, pursuant to 28 C.F.R. § 28.12, the DNA Fingerprint Act of 2005, and the Adam Walsh Child Protection and Safety

---

[74] Appx. 9.
[75] *See, e.g.*, Appx. 1971.
[76] *United States v. Chasmer*, 952 F.2d 50, 52 (3d Cir. 1991) (quoting *United States v. Villano*, 816 F.2d 1448, 1450 (10th Cir. 1987)).
[77] *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up).

Act of 2006."[78] Banks contends that the District Court's reference to the Adam Walsh Act should be excised because the Act enacted the Sex Offender Registration and Notification Act and "the false implication that a person is a sexual offender carries enormous social and legal disadvantages."[79] In its oral sentence, the District Court simply said Banks must "participate in the collection of DNA as directed by the probation office."[80] Neither reference to the Adam Walsh Act in the written sentence nor the District Court's oral sentence give the false implication that Banks is a sexual offender. Again, nothing about requiring Banks to participate in DNA collection or referencing the Act "seriously affects the fairness, integrity or public reputation of judicial proceedings."[81]

## III.

For the reasons stated above, we will affirm the District Court's order denying Banks's request to waive his right to counsel as well as the District Court's order imposing special conditions of supervised release. Because we hold that "loss" in the context of U.S.S.G. § 2B1.1 is not ambiguous, we will vacate the judgment of sentence and remand this case so that the District Court can resentence Banks without the intended-loss enhancement.

---

[78] Appx. 8.
[79] Appellant's Br. at 56-57.
[80] Appx. 1972.
[81] *Williams*, 974 F.3d at 340 (quoting *Olano*, 507 U.S. at 732).